**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Veronica M. THOMPSON and Veronica
Andalon, Defendants–Appellants.**

Nos. 95–3356, 95–3357.

United States Court of Appeals,
Seventh Circuit.

Argued May 20, 1996.

Decided Feb. 11, 1997.

Bruce E. Reppert (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for U.S.

Charles F. Benninghoff, III, Martin G. Molina (argued), Benninghoff & Ramirez, San Juan Capistrano, CA, for Veronica M. Thompson.

Before CUDAHY, COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

A jury found defendants Veronica Thompson and Veronica Andalon guilty of conspiracy and possession of marijuana with intent to distribute it. 21 U.S.C. §§ 846, 841. They appeal their convictions and sentences, arguing that (1) the district court should have suppressed evidence seized following a traffic stop, because Thompson did not voluntarily consent to her vehicle being searched; (2) the evidence was insufficient to support the convictions; and (3) because they cooperated fully with the authorities, the court should have granted a downward departure from their sentences under the provisions of 18 U.S.C. § 3553(f). We affirm.

## I.

According to the facts revealed at trial, which we construe in the light most favorable to the government on appeal, *United States v. Rogers*, 89 F.3d 1326, 1334 (7th Cir.1996), Illinois State Police Trooper Robert Eisenbarger was performing a routine patrol on December 12, 1994. He clocked a closed rental truck going 61 miles per hour in a 55 mile per hour zone. Eisenbarger pulled up alongside the truck to see who was driving it, whereupon its speed dropped below the 45 mile per hour minimum. He also noticed another car with California license plates, which appeared to be tailing the rental truck. Both vehicles were equipped with CB radio antennae. When Eisenbarger pulled the rental truck over, the tail vehicle continued on its way.

Defendant Veronica Thompson was driving the truck, and defendant Veronica Andalon was riding as a passenger. Eisenbarger asked Thompson to sit in his squad car while he issued her a written warning for the violation, and checked her license on the squad car's computer. She acceded. While waiting for the computer check on her license, Eisenbarger engaged Thompson in casual conversation. Thompson told Eisenbarger that she was moving to New York. When Eisenbarger asked if she had an apartment, Thompson replied that she did not know the address, but had a phone number to call when she got there.

At one point, Eisenbarger left Thompson in the squad car and went back to the truck, where he asked Andalon for the rental agreement. Andalon acted nervous, but handed him some papers. When he got back to the squad car, Eisenbarger found out they were not the correct documents, so he had Thompson return to the truck and retrieve the rental agreement. She complied, whereupon Eisenbarger completed the written warning for the speeding violation. Eisenbarger, unbeknownst to Thompson, also filled out a Consent-to-Search form, using the information which Thompson had given him. When he had completed the forms, Eisenbarger returned the rental agreement and Thompson's driver's license. He gave Thompson the warning, and told her that if she signed it, she would be free to go.

Thompson signed the agreement, and moved to open the door of the squad car. Eisenbarger then asked if she would mind answering a few more questions. Thompson told him to go ahead. Eisenbarger explained that part of his duty was to investigate the transport of illegal drugs and guns. He asked if Thompson had any guns in the truck. She said she did not. He then asked if she had any illegal drugs. She looked away, and then said no again. Thereupon, Eisenbarger handed her the completed consent-to-search form, and explained what it was. He told her she did not have to sign it. Thompson examined the form, and then signed it. She then volunteered to Eisenbarger that some of the furniture in the truck belonged to a friend named Bill Smith, and she was taking it to New York as a favor.

Eisenbarger went into the cargo area of the truck, and immediately noticed the strong odor of a deodorizer. He searched

some boxes near the passenger compartment, and found bundles of compressed marijuana wrapped in heat-sealed plastic and smeared with a gel deodorizer. He then arrested Thompson and Andalon, took them to Illinois State Police headquarters, and impounded the truck. Before either defendant had a chance to make a telephone call, an attorney from St. Louis called State Police headquarters to inquire about their arrest.

The police completed a thorough search of the rental truck, although the smell from the deodorizer was so overpowering that it was necessary to remove the vehicle from the police garage. The search revealed two refrigerators sealed with caulk, and filled with more marijuana. Police found a total of about 630 pounds of marijuana, with an estimated street value of $1.1 million. A fingerprint which matched defendant Thompson was lifted from one of the plastic bags in which the marijuana was wrapped. Further investigation revealed that the tail vehicle, which left the scene when Eisenbarger pulled the truck over, was registered to Jose Luis Romero, a convicted narcotics trafficker. Shortly before the incident in question, Romero had been seen with Guillermo Flores Andalon, a convicted marijuana trafficker who was defendant Andalon's brother, and Thompson's brother-in-law. Neither Romero nor Guillermo Andalon were arrested in connection this case.

DEA agents interviewed both Thompson and Andalon at police headquarters. Both claimed ignorance of the marijuana found in the truck. Thompson explained that she ran her own import/export business, and was changing her base of operations from San Diego to New York. Before she left California, she got a call from a man named Bill Smith, whom she had met some months earlier at a San Diego disco. She had seen Bill Smith and his brother John socially on two subsequent occasions. According to Thompson, when she told Bill Smith that she was moving her business to New York, he offered to help pay her moving expenses if she would take some of his furniture to New York. Bill

Smith was unable to move the items himself, she explained, because he had broken his leg. Bill Smith also gave her extensive directions about renting the truck, and the route she should take to New York.

Defendant Andalon's version of events differed slightly. She stated that she and Thompson had met John Smith at a disco in Tijuana. According to Andalon, she and Thompson were going to New York on vacation. When John Smith learned of their vacation plans, he asked if they would help him move some furniture to a house he owned in Philadelphia, in exchange for his paying for the rental truck. It was John Smith, according to Andalon, who had the broken leg. Both defendants consistently denied any knowledge of the tail vehicle Trooper Eisenbarger noticed following their truck.

A federal grand jury indicted Thompson and Andalon for conspiracy and possession of marijuana with intent to distribute it. 21 U.S.C. §§ 846, 841. Defendants filed a motion *in limine* to exclude the seized evidence on the ground that Thompson did not voluntarily consent to the search. The district court denied the motion following a suppression hearing. A jury convicted the defendants on both counts. The court sentenced them to concurrent sentences of sixty-three months in jail on each count, at the bottom end of the range prescribed by the Sentencing Guidelines.

## II.

### A.

Defendant Thompson[1] argues that district court should have suppressed the evidence seized from the rental truck, because she did not voluntarily consent to the search. The voluntariness of a consent to search is a finding of fact to be determined from the totality of the circumstances. *United States v. Stribling*, 94 F.3d 321, 324 (7th Cir.1996). A consent obtained during an ille-

---

1. The truck was rented in Thompson's name, and Andalon was merely a passenger. Because we conclude that Thompson voluntarily consented to the search, we need not reach the question of

whether Andalon would have had standing to challenge the legality of the search. See *United States v. Padilla*, 508 U.S. 77, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993).

gal detention is invalid unless the state proves that the consent resulted from an independent act of free will. *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983). We review the denial of a motion to suppress evidence for clear error. *United States v. Marshall*, 79 F.3d 68, 69 (7th Cir.1996).

Thompson concedes that the state trooper had probable cause to make the initial traffic stop, that he told her she was free to leave after he gave her a written warning about speeding and returned her identification, and that this statement ended the traffic stop. She complains only that before she had a chance to get out of the squad car, the trooper turned toward her and asked if she would answer more questions. This action, she maintains, negated the previous permission to leave, transformed the additional questioning into an unlawful detention, and created an inherently coercive atmosphere which compelled her to accede to the trooper's request, and thus tainted her consent to the search. The trooper, Thompson contends, should have reiterated that even though he wanted to ask more questions, she was still free to leave.

■ A recent Supreme Court decision dooms Thompson's argument. *Ohio v. Robinette*, —— U.S. ——, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). The Fourth Amendment, the Court teaches, does not even require that a lawfully seized defendant be told that she is free to go before her consent to a search will be recognized as voluntary. *Id.* at ——, 117 S.Ct. at 419. Robinette reaffirmed that courts must apply an objective standard in determining whether an action was lawful under the Fourth Amendment. Thus, the appropriate test for assessing the coercive effect of police conduct is whether a reasonable person, viewing the particular police conduct as a whole and within the setting of all the surrounding circumstances, would have concluded that the officer had in some way restrained her liberty so that she was not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988).

■ Thompson argues, in effect, that there can be no consensual interrogation of a citizen in the confines on a police squad car. That is contrary to the law of this circuit. See *United States v. Rivera*, 906 F.2d 319, 323 (7th Cir.1990) (defendant who remained seated in squad car after officer returned his identification and told him he was free to go consented to subsequent search). In the case before us, the trooper explicitly told Thompson that she was free to leave. He then justified his desire to ask Thompson more questions by explaining that part of his job was to prevent the transport of illegal guns and drugs. Moreover, the trooper told Thompson that she did not have to sign the consent to search form. In other words, the trooper did everything that the law requires him to do: he returned the defendant's identification to her, informed her of her rights, and explained both what he was doing and why he was doing it. That Thompson subjectively perceived his actions as coercive does not render them objectively unreasonable—and, as noted above, "reasonableness . . . is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, —— U.S. at ——, 117 S.Ct. at 421. Because she was not in custody, the consent was not the product of coercion. "[T]he law is well established that if the officer asks rather than commands, the person accosted is not seized, and so the protections of the Fourth Amendment do not attach." *United States v. DeBerry*, 76 F.3d 884, 885 (7th Cir.1996). Since no Fourth Amendment violation occurred, the evidence is not subject to suppression. The record thus supports the district court's finding that Thompson voluntarily consented to the search. Thompson presents "nothing to overcome the substantial deference we afford the district judge." *United States v. Lomeli*, 76 F.3d 146, 149 (7th Cir.1996).

### B.

■ Thompson and Andalon next claim that the evidence was insufficient to convict them. Instead, they insist that it demonstrates that they were mere "mules," who unwittingly associated with the true conspirators, and were duped into transporting the marijuana. We review the evidence and all inferences therefrom in the light most favor-

able to the government, and will reverse a conviction "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Gutierrez*, 978 F.2d 1463, 1468–69 (7th Cir.1992). This places a heavy burden on the defendants, *United States v. Campbell*, 985 F.2d 341, 344 (7th Cir.1993), which Thompson and Andalon have failed to meet.

The defendants do little more on appeal than reiterate the story they told at trial, and insist that it is the most plausible version of events. Thompson asserts that the furniture she was transporting was consistent with her claim that she was moving her business from San Diego to New York. She further explains that Guillermo Flores drove her to the office where she rented the truck, and when she got into his car, she tossed some plastic bags into the back seat. The true conspirators, she suggests, later used one of these bags to wrap the marijuana, which explains how her fingerprint got onto the bundle. Thompson justifies her decision to move a truckload of furniture across the country without first having found a place to stay with the explanation that she was a Jehovah's Witness, and planned to contact the Jehovah's Witnesses in New York to help her find a place to live. Andalon steadfastly maintains that she was merely a passenger, going to New York on vacation.

As we have noted in other cases, "[Such] arguments are irrelevant: the issue on appeal is not whether there was ... evidence to support [defendants'] claim of innocence, but whether there was any evidence from which a jury reasonably could have inferred that [they] knew [they] were carrying [drugs]." *United States v. Uriostegui–Estrada*, 86 F.3d 87, 89 (7th Cir.1996). The government presented substantial evidence at trial to undermine defendants' version of events and establish that they knowingly conspired and possessed the marijuana. See *United States v. Durrive*, 902 F.2d 1221, 1228 (7th Cir.1990). The government pointed out that the defendants spent three days in a closed truck which smelled overpoweringly of deodorizer, which obviously would or should have aroused their suspicions about their car-

go. Both denied any knowledge of any "tail vehicle" (which was registered to a convicted marijuana trafficker who happened to be an associate of defendant Andalon's brother, also a convicted marijuana trafficker), but were unable to explain how an attorney called the police about their arrest before either had a chance to make any phone calls. Moreover, Thompson had packed very little clothing, which was inconsistent with her claim that she was moving her goods permanently to New York; the furniture was old and battered, and one table still had a tag suggesting that it had recently been bought at a thrift shop. The government also pointed out that defendants' stories were not the same: Thompson said Bill Smith (who, according to Thompson, owned three houses but had no telephone) asked for her help. According to Andalon it was John Smith who asked for help (although both Smiths had broken legs, depending on which defendant was telling the story). Thompson initially told DEA agents that both she and Andalon were present when the property was loaded onto the truck; Andalon contradicted this story and stated that the truck was fully loaded when she met up with Thompson. Andalon said the two of them were going on vacation; Thompson claimed she was travelling on business, although, despite carrying numerous credit cards, she paid for the entire trip in cash and kept no records or receipts, which one might expect a businessperson to do for tax purposes.

A rational jury could have credited the government's attacks on the plausibility of defendants' version of events, and then concluded that defendants knew they were transporting marijuana. See *Uriostegui–Estrada*, 86 F.3d at 89 (where jury concludes that defendant's claim of innocent possession is implausible, it is entitled to infer that defendant knew she was carrying drugs). That is sufficient to convict the defendants both for conspiracy and for possession of marijuana with intent to distribute it, because the quantity of marijuana was great enough to infer intent to distribute. *Id.*; see also *United States v. Burrell*, 963 F.2d 976, 988 (7th Cir.1992) ("the trier of fact is free to choose among various reasonable construc-

tions of the evidence"). That the government's evidence of conspiracy was wholly circumstantial does not mean it was not sufficient to convict. *United States v. Moore,* 936 F.2d 1508, 1524 (7th Cir.1991). Defendants' argument boils down to nothing more than a claim that theirs is most plausible version of events. We have long recognized, however, that the government "is not required to exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilty beyond a reasonable doubt." *Burrell,* 963 F.2d at 988. Accordingly, based on the facts presented at trial, we hold that the defendants have not met the burden of proving that no rational jury could have found them guilty beyond a reasonable doubt.

### C.

■■■ Last, defendants argue that the district court should have granted them a downward departure from the five-year statutory minimum sentence, under the provisions of 18 U.S.C. § 3553(f).[2] This so-called "safety valve" statute "directs that statutory minima shall not apply to first time nonviolent drug offenders who were not organizers of criminal activity and who have made a good faith effort to cooperate with the government." *United States v. Arrington,* 73 F.3d 144, 147 (7th Cir.1996). The only question before us on appeal is whether the sentencing court correctly concluded that neither Thompson nor Andalon cooperated with the government in good faith. We review a sentencing court's determination that a defendant is ineligible for a sentence reduction under § 3553(f) for clear error. *United States v. Rodriguez,* 69 F.3d 136, 144 (7th Cir.1995). No such error is apparent here.

■■■ Defendants contend that the trial court ruled that they failed to cooperate only because they refused to plead guilty and

proceeded to trial. The record, however, does not support the defendants' contention. The sentencing transcript reflects that the court considered not only the trial and resultant verdict, but also the Presentence Reports, which indicated that neither defendant cooperated fully with the Probation Officer. Moreover, at the sentencing hearing, after defendants' counsel claimed that they were entitled to a downward departure because they had told the government everything they knew, the court specifically questioned both the United States Attorney and the Probation Officer about defendants' cooperation with the government. Both reiterated that the defendants were not fully cooperative; the United States Attorney entered into the record a lengthy statement outlining the government's position that no such cooperation took place. The sentencing court was entitled to find these statements credible, and we defer on appeal to his findings on credibility. *Rodriguez,* 69 F.3d at 144. Because the provisions of § 3553(f) apply only to defendants who cooperate fully with the government, we cannot say that the sentencing court committed clear error in refusing to grant these defendants a downward departure under the safety valve provisions of § 3553.

■■■ Finally, we note that the defendants are using faulty logic in their attempt to obtain reduced sentences, in essence arguing that even though the jury rejected their claim that they were not involved in the drug conspiracy, the same alleged lack of involvement supports their right to a reduced sentence. They told the government all they knew, they argue, but the information was not useful because they were mere dupes who were connived into transporting the marijuana, and therefore knew little about the drug ring. It is true that the information which defendants provide need not prove

---

2. The statute reads in pertinent part:
   "Notwithstanding any other provision of law . . . the court shall impose a sentence . . . without regard to any statutory minimum sentence, if . . . (5) Not later than the time of the sentencing hearing, the defendant has truthfully provided to the government all information and evidence the defendant has concerning the offense or offenses that were part of the same

course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide, or that the government is already aware of the information, shall not preclude a determination by the court that the defendant has complied with this requirement."
18 U.S.C. § 3553(f)(5). The statute is synonymous with U.S.S.G. § 5C1.2.

useful to the government, as long as they cooperate fully. *United States v. Montanez*, 82 F.3d 520, 522 (1st Cir.1996). But Thompson and Andalon told the same story to the jury which, as we noted above, acted rationally in rejecting it and convicting them. The sentencing judge was entitled to reject the claim of non-involvement, too. Because Congress' purpose in enacting the safety-valve statute was to permit lenience toward low-level defendants "who did their best to cooperate," *id.*, the safety valve provision requires that defendants act in good faith. As a result, the court's assessment that defendants continued to cling to a false version of events and dispute their own culpability, up to and including the sentencing hearing, is a sufficient basis for refusing to invoke the safety valve provision. Denying involvement is not the same as lacking useful information. It would be illogical if defendants could use the very story which led to their conviction as a means of obtaining a reduced sentence.

## CONCLUSION

The totality of the circumstances indicate that Thompson voluntarily consented to the search which revealed the illicit drugs. The evidence which resulted from this search and the subsequent investigation was sufficient for a rational jury to convict both defendants. Finally, the sentencing court did not commit clear error in finding that the defendants did not cooperate fully with the government, and therefore refusing to impose less than the statutory minimum sentence under the safety valve provisions of 18 U.C.S. § 3553(f).

AFFIRMED.

RIPPLE, Circuit Judge, with whom CUDAHY, Circuit Judge, joins, concurring.

I join the judgment and the opinion of the court. The government's treatment of Ms. Andalon's sufficiency claim is sketchy at best, and the opinion of the court gives the issue comparatively little attention. Upon examination of the record evidence, however, I am satisfied that the government has met its burden in this case. Ms. Andalon's role in the trip and its preparations could have been interpreted by a reasonable jury as evidence of her guilt in the charged offenses.