Filed: April 16, 2001

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

No. 98-4628
(CR-97-733)

_____

United States of America,

Plaintiff - Appellee,

versus

Gary Dean Boone,

Defendant - Appellant.

_____

O R D E R

_____

The court amends its opinion filed March 30, 2001, as follows:

On page 7, second full paragraph, line 2 -- the reference to "874 F.3d 213" is corrected to read "874 F.2d 213."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 98-4628

GARY DEAN BOONE,
Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Cameron McGowan Currie, District Judge.
(CR-97-733)

Argued: September 25, 2000

Decided: March 30, 2001

Before WIDENER and LUTTIG, Circuit Judges, and
Jackson L. KISER, Senior United States District Judge
for the Western District of Virginia, sitting by designation.

_____

Affirmed in part, reversed in part, and remanded by published opin-
ion. Judge Widener wrote the opinion, in which Judge Luttig con-
curred. Senior Judge Kiser wrote an opinion concurring in part and
dissenting in part.

_____

COUNSEL

**ARGUED:** William Fletcher Nettles, IV, Assistant Federal Public
Defender, Florence, South Carolina, for Appellant. Thomas Ernest
Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washing-

ton, D.C., for Appellee. **ON BRIEF:** J. Rene Josey, United States Attorney, Alfred W. Bethea, Jr., Assistant United States Attorney, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

## OPINION

WIDENER, Circuit Judge:

Gary Dean Boone (Boone) appeals the district court's failure to appoint a second lawyer to represent him under 18 U.S.C. § 3005 (2000) in his trial for violating 18 U.S.C. § 844(i) (2000), damaging or destroying a vehicle by explosive, Count II of the indictment. For the reasons that follow, we vacate his conviction under Count II and remand this case to the district court for retrial. Boone also alleges that the district court erred under the Fourth Amendment in denying his motion to suppress a rifle seized from his home and used in his trial under Count I of the indictment, in violation of 18 U.S.C. § 922(g)(1), possession of a firearm by a convicted felon. Finding no reversible error, we affirm the conviction on Count I, but remand for reconsideration of the sentence on that count.

I.

Boone and his wife, Sharon Boone, practiced an alternative-lifestyle marriage, in which both had sexual relations with other people. In October 1996, Sharon Boone, with Boone's knowledge, began a relationship with Jessie Pressley (Pressley). She fell in love with Pressley, and in March or April 1997, Sharon Boone told Boone that she wanted a divorce. Boone, however, did not want a divorce. During one weekend in August 1997, Boone told Sharon Boone that he had purchased a gun and that if she left him he would kill her, write a letter to their daughter explaining why he acted this way, and commit suicide.

Sharon Boone subsequently moved out of their marital home and sought legal protection from Boone. On August 29, Sharon Boone filed a petition for a restraining order against Boone in a local family

2

court. On September 6, Sharon Boone moved into a women's shelter and on September 10, the family court issued a restraining order against Boone.

During late August and early September, Pressley spoke with a state court judge about issuing a restraining order against Boone and informed the court of the history between himself and Boone. On September 16, Boone called Sharon Boone and read the contents of a birthday card that Sharon Boone had sent to Pressley. Sharon Boone notified Pressley, and Pressley then subsequently reported to the police that his home had been burglarized and that several birthday cards he received from Sharon Boone were missing. Deputy Sheriff Gary Deaver arrived at Pressley's home to investigate the call. Deaver advised Pressley to obtain a restraining order. On September 17, Pressley filed an application for a restraining order against Boone. This application stated that: 1) on August 5, Boone told Pressley not to see Boone's wife and that he would kill Pressley if he did; 2) in September, Boone told Pressley that Pressley's days were numbered; and 3) on September 15, Pressley believed that Boone burglarized his home. On September 18, the state court issued restraining orders against both Boone and Pressley.

On September 17, at Sharon Boone's request, an arrest warrant and mental evaluation order were issued for Boone. Law enforcement agents took Boone to a mental evaluation center in Columbia, South Carolina, and he was discharged from the hospital about a week later. Boone admitted to breaking the restraining order previously obtained by Sharon Boone.

On October 10, 1997 at around 7:15 a.m., a 1993 Chevrolet pickup truck[1] driven by Pressley exploded in Cheraw, South Carolina. A pipe bomb was hidden under the truck, and when it exploded, it killed

_____

[1] The truck was owned by the Contract Construction Company, a South Carolina business that did work in other states, including Kentucky and Indiana. Contract Construction had authorized Pressley to drive the truck. Because the truck was used commercially in interstate commerce, federal jurisdiction under § 844(i) was exercised. See Jones v. United States, ___ U.S. ___, 120 S. Ct. 1904, 1909-10 (2000) (requiring that property be used in an activity affecting commerce).

3

Pressley instantly. Sharon Boone learned of Pressley's death while she was at work on October 10. Boone called Sharon Boone at work, and she accused him of the bombing. Boone either laughed, or said that she was "bullshitting" and hung up. After learning of Pressley's death on the morning of October 10, Sharon Boone called the state court judge that issued the restraining orders and demanded an investigation into Boone's whereabouts. Members of the Chesterfield County Sheriff's Department, Ronnie Huntley and C. Kenneth Welch, subsequently went to Sharon Boone's workplace. Sharon Boone told them that she had received a couple of phone calls from Boone and that she accused Boone of the bombing. Sharon Boone said that she feared for her life because Boone had threatened her. As the officers were talking with Sharon Boone, they witnessed Boone drive slowly by her workplace. The officers then followed Boone and directed him to stop.

The officers approached Boone with guns drawn, ordered Boone to exit from his truck, frisked him for firearms, and read the Miranda rights to him. The primary purpose in stopping Boone was to ascertain whether he possessed any weapons or explosive devices. Deputy Huntley handcuffed Boone, and the officers notified the South Carolina Law Enforcement Division (SLED) of Boone's whereabouts. SLED agents asked Huntley to detain Boone until they could arrive. Boone told the agents that he heard about the bombing and that he hoped he was not a suspect. Boone agreed to stay and talk with the SLED agents when they arrived. Boone was never told he could leave, but he was cooperative. About 1 to 1-1/2 hours after Boone was stopped, SLED agents Billy Joe Abercrombie and William Poole arrived with a bomb-sniffing dog. Boone signed a consent to search form for a search of his truck. Agent Poole and a bomb-sniffing dog searched the truck. The dog alerted on the glove compartment, resulting in the discovery of some shells. After the search of the truck, Deputy Huntley removed the handcuffs from Boone.

The agents then asked Boone to consent to a search of his house. Boone signed a consent to search form for his residence, which limited the search to explosives only. Boone and the agents then drove to Boone's house. During the search for explosives, Agent Poole observed a Marlin 30/30 caliber rifle and some bullets in a closet in the bedroom. Agent Poole did not seize the rifle. Boone then accom-

4

panied the SLED agents to a local jail, where Boone admitted to an agent that he had purchased the rifle that was in his house. Later that day, the state officers briefed Bureau of Alcohol, Tobacco and Fire-arms (BATF) agent David Lazar about the search of Boone's residence. After learning that Boone was a convicted felon, BATF agents Lazar and Raymond Glover applied to a federal magistrate judge for a search warrant of Boone's house for firearms, explosives, and computers.[2]

The magistrate judge issued the warrant. Agents then executed the warrant and seized the rifle from the master bedroom. Sharon Boone consented to a search of the truck and a storage shed next to Boone's house in which six rounds of 30/30 ammunition and other ammunition from Boone's truck were seized. Various pieces of pipe, metal, wires, tape and electrical components were also seized from his residence and workplace. Agents then arrested Boone for possession of a firearm by a convicted felon.

As stated, Boone was charged in a two-count indictment. Count I charged Boone with violating 18 U.S.C. § 922(g)(1) (2000) because he was a felon in possession of a firearm.[3] Count II charged Boone

_____

[2] The affidavit prepared by Glover stated that: 1) Pressley had been killed by a pipe bomb; 2) Boone made threats to kill Pressley because of his love affair with Sharon Boone; 3) state agents stopped Boone's car shortly after the bombing; 4) a consent search of Boone's residence resulted in the observation of a rifle; 5) and Boone, a convicted felon, had admitted that he owned the rifle. The affidavit also stated that: 1) Boone's daughter said she had seen a pair of gloves and small wires at Boone's house one week earlier; 2) she overheard Boone making threats to kill Pressley; 3) the day before, there was a car backed up by the house "as if trying to hide;" and 4) in Glover's opinion, small wires and gloves are used to make explosives. Finally, the affidavit stated that: 1) the investigation of the bomb site resulted in the discovery of pipe fragments and a wire; 2) a plant engineer at Boone's place of business stated that Boone asked him for information on bomb building and that the plant engineer directed him to the Internet; and 3) Sharon Boone stated that Boone had a computer at his home.

[3] This statute states in pertinent part:

> It shall be unlawful for any person who has been convicted in any court of, a crime punishable by imprisonment for a term

with bombing the truck in violation of 18 U.S.C.§ 844(i) (2000).**4**
Boone was tried separately for each offense.**5** Boone filed a motion to
suppress the introduction of the items seized from his home. The dis-
trict court denied the motion because it found that the state agents had
a "reasonable basis" to stop Boone based on their knowledge of the
bombing, the history between Pressley and Boone, the information
learned from Sharon Boone, and Boone's slow drive-by of Sharon
Boone's workplace. The district court found that the handcuffing of
Boone was reasonable until the danger to the officers was dispelled
by the bomb-sniffing dog, that Boone voluntarily consented to the
searches of his truck and home, and that Boone voluntarily admitted
that the firearm belonged to him. The court ruled that Agent Poole
saw the rifle in plain view and that the agents' later discovery that
Boone was a felon justified issuing a search warrant for the rifle. The
district court's holding as legally ineffective Boone's limiting to
explosives his consent to search his home is of no moment because
the rifle was in plain view and was seen during the voluntary search.

_____

> exceeding one year . . . to ship or transport in interstate or for-
> eign commerce, or possess in or affecting interstate commerce,
> any firearm or ammunition; or to receive any firearm or ammuni-
> tion which has been shipped or transported in interstate or for-
> eign commerce.

18 U.S.C. § 922(g)(1) (2000).

**4** This statute states in pertinent part:

> Whoever maliciously damages or destroys, or attempts to dam-
> age or destroy, by means of fire or an explosive, any building,
> vehicle, or other real or personal property used in interstate or
> foreign commerce or in any activity affecting interstate com-
> merce or foreign commerce shall be imprisoned for not less than
> 5 years and not more than 20 years, fined under this title, or both
> . . . and if death results to any person . . . as a direct or proximate
> result of conduct prohibited by this subsection, shall also be sub-
> ject to imprisonment for any term of years, or to the death pen-
> alty or to life imprisonment.

18 U.S.C. § 844(i) (2000).

**5** Even though Boone was tried separately for each offense, he was sen-
tenced for both convictions at the same time, the counts having been sev-
ered for trial by order of the district court of December 22, 1997. The
government did not seek the death penalty. Br. of United States, p.10.

6

Also, along the same line, of no moment is the district court's additional holding that the inevitable discovery rule would support the search unless supported for the reasons given, which it was. Boone was found guilty on Count I, possession of the rifle, on January 8, 1998 and was sentenced to ten years' imprisonment.

Boone's trial on Count II commenced on June 15, 1998. Prior to its commencement, on February 11, 1998, Boone filed a pro se letter to the district court stating, "Finally, the penalty for count II of the indictment is death, life or any number of years. At what point is additional counsel available? . . . If additional counsel is available, I request that he/she assist Mr. Nettles under his direction." The district court did not respond to this request, but did note in a hearing held on February 23, 1998, that the issues raised in Boone's letter were preserved. Boone again raised his 18 U.S.C. § 3005 argument at his sentencing hearing. Boone was represented by one attorney at trial. On June 23, 1998, a jury found Boone guilty of Count II. The district court sentenced Boone to life in prison. On August 25, 1998, Boone appealed his convictions and sentences in the district court.

II.

We exercise jurisdiction under 28 U.S.C. § 1291. We review questions of law de novo. See United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir. 1989). The question initially presented in this case is whether Boone was entitled to the assistance of two attorneys under 18 U.S.C. § 3005 because he was indicted under a statute that carries the death penalty as a maximum sentence, even though the government did not seek the death penalty.[6] Because we are of opinion that 18 U.S.C. § 3005 provides an absolute statutory right to two attorneys in cases where the death penalty may be imposed, we vacate Boone's conviction and remand to the district court for retrial.

_____

[6] Boone also alleges that the district court erred in his trial on Count II because it wrongfully admitted testimony of a deceased out-of-court declarant under Federal Rule of Evidence 803(3). Because we are remanding this case to the district court for retrial in light of the 18 U.S.C. § 3005 violation, we express no opinion on this alleged violation.

7

Congress first created a right to two attorneys in a capital case in 1790. See 1 Stat. 118-119; see also United States v. Watson, 496 F.2d 1125, 1130 (4th Cir. 1973) (Murray, J., dissenting) (noting history of passage of two-attorney requirement). Congress codified the two-attorney requirement for capital cases in § 3005 in 1948. See 62 Stat. 814. Prior to 1994, 18 U.S.C. § 3005 provided,"Whoever is indicted for . . . capital crime shall be allowed to make his full defense by counsel learned in the law" and upon the defendant's request, the district court shall "assign to him such counsel, not exceeding two, as he may desire." 18 U.S.C. § 3005 (1986). In 1994, Congress amended § 3005, contemporaneously with the passage of the Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591-3598 (108 Stat. 1959-1968). Section 3005 currently provides in pertinent part:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases . . . .

18 U.S.C. § 3005 (2000) (108 Stat. 1982).

Boone argues that 18 U.S.C. § 3005 creates an absolute right to two attorneys in cases where the death penalty may be imposed, even when the government does not, in fact, seek the death penalty. The government, in contrast, argues that the statutory right only applies in cases where the government seeks the death penalty. The government essentially argues that our precedent in United States v. Watson, 496 F.2d 1125 (4th Cir. 1973), in which we held that under § 3005 two attorneys are required even in cases where the death penalty is not sought, indeed, by law could not be sought in Watson, is no longer valid because of the 1994 amendment to § 3005. In this regard, it argues that the addition of the phrase "applicable to capital cases" to the "learned in the law" requirement contemporaneously with the promulgation of the Federal Death Penalty Act signifies that Congress' intent was to provide additional counsel only when the defendant is actually exposed to the death penalty.

8

We are of opinion that Boone's interpretation of 18 U.S.C. § 3005 is correct and that the 1994 amendment to § 3005 does not mandate overturning our decision in <u>Watson</u>. Initially, for § 3005 to apply, a defendant must be indicted for a "capital crime." As we held in <u>Watson</u>, a capital crime is one in which the death penalty may be imposed under the terms of the enabling statute. See <u>United States v. Watson</u>, 496 F.2d 1125, 1126-27 (4th Cir. 1973) (holding that Watson was indicted for "capital crime" under a statute that authorized the death penalty even though imposition of that penalty was legally impossible because of a recent Supreme Court case). Boone was indicted under 18 U.S.C. § 844(i), which provides that if use of an explosive in interstate commerce results in death, the defendant may be subject to "imprisonment for any term of years, or to the death penalty, or to life imprisonment." 18 U.S.C. § 844(i). Because the maximum punishment available by statute is death, § 844(i) is by definition a capital crime. Thus, § 3005 applies in this case. **7**

The parties here do not dispute the general applicability of § 3005. Rather, the dispute surrounds the triggering event for application of § 3005--in all cases where the death penalty could be imposed because the enabling statute defines it as a capital crime, or only in those cases where the death penalty is actually sought by the government. To determine the scope of a statute, interpretation begins with its plain text. See <u>United States v. Wells</u>, 519 U.S. 482, 483 (1997) (stating that the "first criterion in the interpretative hierarchy, [is] a natural reading of the full text"). In this case, the current language of § 3005 is clear--the requirement of two attorneys is triggered upon indictment. The statute begins with the phrase "Whoever is <u>indicted</u> for . . . <u>capital crime</u> . . ." (emphasis added). 18 U.S.C. § 3005 (2000). This language provides the statutory trigger for the section, and the text is clear that the statute becomes applicable upon <u>indictment</u> for

_____

**7** The defendant must also request the appointment of a second lawyer for the two-attorney requirement to apply. See <u>United States v. Williams</u>, 544 F.2d 1215, 1218 (4th Cir. 1976); see also 18 U.S.C. § 3005 ("[A] judge thereof, shall promptly, <u>upon the defendant's request</u>, assign 2 such counsel.") (emphasis added). On February 13, 1998, Boone wrote a letter to the district court judge inquiring into when second counsel would be available because he was charged with a crime that carries the death penalty.

9

a capital crime and not upon the later decision by the government to seek or not to seek the death penalty. As discussed above, § 844(i) qualifies as a capital crime because the death penalty is the maximum sentence that could be imposed on Boone.

The government argues, however, that the 1994 amendment to § 3005 required rethinking our holding in Watson because it shows Congress' intent that § 3005 applies only when the death penalty is sought. It directs us to a Tenth Circuit case stating that the 1994 amendment "substantively changed [§ 3005], creating a new requirement which previously had not existed." See United States v. McCullah, 76 F.3d 1087, 1098 (10th Cir. 1996). The Tenth Circuit held that counsel must now be "learned in the law applicable to capital cases" not merely "learned in the law" as was necessary under the previous version of § 3005. McCullah, 76 F.3d at 1098. We decline to decide whether this wording creates a new requirement under the Act. But, even supposing for argument that it does, it is sufficient to emphasize that this change had no effect on the statutory trigger for application of § 3005, "Whoever is indicted . . . for capital crime." Indeed, this triggering language is identical under the pre- and post-1994 versions of the Act. Compare 18 U.S.C. § 3005 (1986) ("Whoever is indicted for . . . capital crime shall be allowed to make his full defense by counsel . . . ."), with 18 U.S.C. § 3005 (2000) ("Whoever is indicted for . . . capital crime shall be allowed to make his full defense by counsel . . . ."), with 1 Stat. 118 (1790) ("[E]very person so accused and indicted . . . shall be allowed . . . such counsel, not exceeding two, as such person shall desire . . . ."). If Congress wished to limit the two-attorney requirement to cases in which the death penalty is actually sought, it could easily have done so. See United States v. Hood, 343 U.S. 148, 151 (1952) ("We should not read such laws so as to put in what is not readily found there."). We decline to read into the statute a requirement that is not readily apparent.

Additionally, as a practical matter, the plain language of § 3005 complements the authorization process for death penalty prosecutions. Current Department of Justice regulations require that the Attorney General authorize all death penalty prosecutions. See United States Department of Justice, U.S. Attorney's Manual § 9-10.020 (June 1998) ("The death penalty shall not be sought without the prior written authorization of the Attorney General."). The government has

10

time between indictment and trial to decide whether it intends to seek the death penalty. See 18 U.S.C. § 3593(a) (2000) ("If . . . the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, <u>a reasonable time before the trial</u> . . . sign and file with the court, and serve on the defendant, a notice . . . .") (emphasis added). Prior to the government's decision to seek or not to seek the death penalty, defense counsel can present mitigating factors counseling against imposition of death. The United States Attorney's Manual states:

> At the time an indictment charging a defendant with an offense subject to the death penalty is filed or unsealed, or before a United States Attorney's Office decides to request approval to seek the death penalty, whichever comes first, the United States Attorney should give counsel for the defendant a reasonable opportunity to present any facts, including mitigating factors, to the United States Attorney for consideration. . . .

<u>United States Department of Justice, U.S. Attorney's Manual</u> § 9-10.030(B) (June 1998). Thus, the appointment of a second lawyer helps the defendant during this preliminary process when that investigation into relevant factors and presentment of information to the United States Attorney occurs. Surely, if the government decides not to seek the death penalty, then the penalty phase is won before trial, and a second lawyer has proven his worth.

We note that our decision today adheres to our precedent in <u>United States v. Watson</u>, 496 F.2d 1125 (4th Cir. 1973) ("[D]efendant has an absolute statutory right to two attorneys under § 3005.").**8** We also

_____

**8** We also affirm <u>Watson</u>'s other conclusion that harmless error review is not applicable to a violation of 18 U.S.C. § 3005 because § 3005 provides an absolute statutory right to two attorneys. See <u>Watson</u>, 496 F.2d at 1130 ("Since in our view, the statute would be eviscerated by application of the harmless error doctrine, we perceive no alternative but to enforce it."). Congress' mandate is unequivocal, and application of harmless error analysis would undermine Congress' clear intent in capital cases.

acknowledge that our interpretation of § 3005 disagrees with the interpretation espoused by several of our sister circuits. See <u>United States v. Grimes</u>, 142 F.3d 1342, 1347 (11th Cir. 1998) ("[A] defendant is not entitled to benefits he would otherwise receive in a capital case if the government announces that it will not seek the death penalty or the death penalty is otherwise unavailable by force of law."); <u>United States v. Shephard</u>, 576 F.2d 719, 729 (7th Cir. 1978) (prior to 1994 amendment) ("There is nothing in Congress' action or inaction over the years to indicate that the two-counsel provision was intended to apply to any case in which a death sentence could not be imposed."); <u>United States v. Weddell</u>, 567 F.2d 767, 770 (8th Cir. 1977) (prior to 1994 amendment) ("We conclude that this case, under <u>Furman v. Georgia</u>, . . . lost its capital nature as charged in the indictment."). Until, however, Congress rewrites § 3005 mandating that it apply only in cases where the death penalty is actually sought by the government, we will not ignore the plain language of the section with its statutory trigger that § 3005 applies upon indictment for a capital crime. As we observed in <u>Watson</u> in 1973,"Section 3005 is unequivocal in its terms. We have no right to rewrite it . .. ." <u>Watson</u>, 496 F.2d at 1130.

III.

Boone also appeals the district court's denial of his motion to suppress the rifle in question in his trial for Count I of the indictment, which charged a violation under 18 U.S.C. § 922(g)(1). A district court's factual finding of consent to search is reviewed for clear error and its legal conclusions are reviewed <u>de novo</u>. See <u>United States v. Elie</u>, 111 F.3d 1135, 1144 (4th Cir. 1997); <u>United States v. Han</u>, 74 F.3d 537, 540 (4th Cir. 1996). We "take care to review findings of historical fact and to `give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" <u>United States v. Sprinkle</u>, 106 F.3d 613, 616-17 (4th Cir. 1997) (quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 699 (1996)).

The Fourth Amendment requires law enforcement officials to obtain a warrant before they conduct a search. See U.S. Const. Amend. IV (protecting "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures"). It is well settled that voluntary consent, however, is an

12

exception to this warrant requirement. See, e.g., <u>Schneckloth v. Busta-monte</u>, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically estab-lished exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.").

Voluntary consent is based on the totality of the circumstances. See, e.g., <u>Schneckloth</u>, 412 U.S. at 223-34; <u>United States v. Lattimore</u>, 87 F.3d 647, 650 (4th Cir. 1996); <u>United States v. Analla</u>, 975 F.2d 119, 124 (4th Cir. 1992). Factors that are appropriate for the district court to consider include the characteristics of the accused (such as age, maturity, education, intelligence, and experience) and the condi-tions under which the consent to search was given (such as the offi-cer's conduct, the number of officers present, and the duration of the encounter). See <u>Lattimore</u>, 87 F.3d at 650. Whether the accused knew he possessed a right to refuse consent is a relevant factor, but the gov-ernment need not demonstrate that the defendant knew of his right to refuse consent to prove that consent was voluntary. See <u>Lattimore</u>, 87 F.3d at 650. Written consent supports a finding that the consent was voluntary. See <u>United States v. Navarro</u>, 90 F.3d 1245, 1257 (7th Cir. 1996). Consent given while in custody may still be voluntary. See <u>United States v. Watson</u>, 423 U.S. 411, 424 (1976). If an individual voluntarily consents to a search while justifiably detained on reason-able suspicion, the products of the search are admissible. See <u>Florida v. Royer</u>, 460 U.S. 491, 502 (1983).

Boone argues that his consent to search his home was not voluntary and that all evidence obtained from the consent he gave to search should have been excluded by the district court. We review the factual findings of the district court for clear error and hold that the district court's factual finding that Boone voluntarily consented to the search of his home was not clearly erroneous.

The district court found that "there was certainly a reasonable basis for the sheriff . . . to stop [Boone's] vehicle on the road" based on the information Sharon Boone gave to the police. Moreover, the district court found that during the time the police were talking with Boone, Boone did not ask to leave, he was cooperating with police and trying "to convince the police that he had nothing to hide," and there was "no indication that he was coerced or his will was overborne." Signifi-cantly, as noted above, Boone signed a consent form to search his

13

house, and he was cooperating with police to deflect suspicion. The consent form stated, "I am giving written permission to these officers freely and voluntarily without any threats or promises having been made, and after having been informed by said officer that I have a right to refuse this search and/or seizure." Boone's limitation of his consent to search for explosives only also suggests that he knew he could refuse consent. See United States v. Elie, 111 F.3d 1135, 1146 (4th Cir. 1997) (noting that revocation of consent demonstrates defendant knew of his right to refuse consent). Moreover, Boone is a convicted felon, which suggests that he was not a newcomer to the law. He was also read his Miranda rights upon being stopped by the officers. Watson, 423 U.S. 424-25. Although Boone was handcuffed until the bomb-sniffing dog arrived, we find nothing in the record that makes the district court's findings of fact clearly erroneous.

We next address Boone's argument that his consent can never be deemed voluntary because it was procured while he was allegedly illegally detained. The Supreme Court has held that consent given while in custody9 may still be voluntary. See United States v. Watson, 423 U.S. 411, 424 (1976). Several Courts of Appeals have also held that consent can be voluntary even if it is procured during an illegal detention, provided that the totality of the circumstances confirms that the consent was not coerced. See, e.g., United States v. Beason, 220 F.3d 964, 966-67 (8th Cir. 2000) (holding that even if Terry stop is illegal, consent can be an act of free will that purges initial illegality); United States v. Guimond, 116 F.3d 166, 170-71 (6th Cir. 1997) (stating that inquiry into whether consent was in fact voluntary must be undertaken and that merely because consent was given during illegal detention does not automatically establish that consent was involun-

_____

**9** We will assume Boone was seized for purposes of the stop because he was handcuffed during the detention until the bomb-sniffing dog arrived, and a reasonable person in that situation would not feel free to leave or terminate the encounter. See Florida v. Bostick, 501 U.S. 429, 434 (1991) ("So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required."); Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred.").

14

tary); <u>United States v. Thompson</u>, 106 F.3d 794, 798 (7th Cir. 1997) (holding that consent to search given during illegal detention may be valid if State proves that consent was not coerced).

Significantly in this case, Boone was given his <u>Miranda</u> rights, gave consent in a public parking lot and not in jail, and signed a consent form. Deputy Huntley read the consent form to Boone. He was told that he was a suspect in Pressley's death and agreed to stay until the SLED agents arrived. In this regard, the district court expressly found that Boone was intentionally cooperating for the purpose of deflecting suspicion. Although Boone was handcuffed during his interaction with law enforcement, he never asked to leave, was cooperating, and even engaged in small talk with the officers. He drove his own car to his home and Sheriff Welch rode with him. These factors suggest that Boone's will was not overborne and that his consent was voluntary, even if the <u>Terry</u> stop exceeded permissible bounds.**10**

_____

**10** We need not determine whether the <u>Terry</u> stop was illegal in this case. We do note, however, that officers may temporarily detain an individual under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), for purposes of questioning the individual or attempting to obtain his consent to a search when reasonable suspicion exists. See <u>United States v. Leshuck</u>, 65 F.3d 1105, 1110 (4th Cir. 1995). A stop must last no longer than is necessary to effectuate the purpose of the stop. See <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983). <u>Terry</u> detentions have been upheld for periods of time necessary to allay law enforcement suspicions for the stop. See, e.g., <u>United States v. Sharpe</u>, 470 U.S. 675, 686-87 (1985) (upholding 20-minute detention upon reasonable suspicion to allow primary investigator to arrive); <u>United States v. McFarley</u>, 991 F.2d 1188, 1193 (4th Cir. 1993) (upholding 38-minute detention upon reasonable suspicion to await arrival for trained dog to sniff luggage permissible under Fourth Amendment); cf. <u>United States v. Montoya de Hernandez</u>, 473 U.S. 531 (1985) (upholding 27-hour detention of alimentary canal drug smuggler).

Reasonable suspicion to detain Boone surely existed based upon his history with Pressley and the information relayed to law enforcement by Sharon Boone. In this case, the district court found that the law enforcement officials were waiting for the arrival of the bomb-sniffing dog to allay their suspicions regarding Boone's possible involvement with the bombing and that Boone was not coerced to stay, even if he was handcuffed. The 1 to 1.5 hour wait for the arrival of the bomb-sniffing dog thus may not have exceeded the bounds of the initial stop. In any event,

15

In summary, although Boone limited the search of his home to explosives only, Officer Poole's observation of the rifle in plain view occurred while he was searching for explosives in a closet and thus did not exceed the scope of the consent. See United States v. McFarley, 991 F.2d 1188, 1191 (4th Cir. 1993) (noting that consent may be circumscribed). This lawful observation of the rifle in plain view during the consent search, combined with the later acquired knowledge that Boone was a convicted felon and Boone's voluntary admission that he purchased the rifle, justified the subsequent issuance of a search warrant for the rifle. Thus, finding no clear error in the district court's decision, the district court's denial of Boone's motion to suppress the rifle is accordingly affirmed.

We note that the district court and counsel raised questions at the sentencing hearing regarding whether Boone's 10-year sentence on Count I would be proper if his conviction on Count II was reversed by an appellate court. Because we have vacated Boone's conviction on Count II, we remand this case to the district court for inquiry into that question.

IV.

Because we are of opinion that the plain language of 18 U.S.C. § 3005 requires that second counsel be appointed upon indictment for capital crimes, regardless of whether the government chooses to seek the death penalty, Boone's conviction under 18 U.S.C. § 844(i) is vacated, and this aspect of the case is remanded to the district court for a new trial.

The decision of the district court denying Boone's motion to suppress the rifle for Count I is affirmed, and his conviction on Count I is affirmed. We remand for consideration of whether Boone should be resentenced on Count I in light of the vacation of Boone's conviction on Count II.

_____

when police exceed the permissible scope of a stop, "[c]onsent to search may, but does not necessarily dissipate the taint of a [prior] fourth amendment violation." United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir. 1993).

16

AFFIRMED IN PART, REVERSED

IN PART, AND REMANDED[11]

KISER, Senior District Judge, concurring in part and dissenting in part:

I concur and dissent. I believe that Boone was not entitled to two attorneys under 18 U.S.C. § 3005. Therefore, I concur with all of the majority's opinion with the exception of Part II, to which I respectfully dissent.

To begin, I disagree with the manner in which the majority frames the § 3005 issue. It claims that "the dispute surrounds the triggering event of application of § 3005," and concludes that <u>indictment</u> for an offense punishable by death is the critical event that triggers the two-attorney requirement. I think this analysis is problematic for two reasons.

First, I think it misconstrues the meaning of § 3005. The expression "Whoever is indicted for . . . [a] capital crime" serves as a restrictive phrase, stating the prerequisites for defendants who seek two attorneys. As I view the matter, indictment is simply the first step in determining whether the defendant will be prosecuted for a capital crime. The offense does not become a "<u>capital</u> crime" until the prosecution gives notice that it will seek the death penalty.[1] It is therefore only at this juncture that the defendant's right to additional counsel under § 3005 vests.

_____

**11** On the motion of Boone's attorney, we have considered the various informal and supplemental briefs submitted by Boone in our consideration of this case. We grant the motion of Boone filed January 3, 2001 to file a supplemental brief and deny the motion of Boone filed February 26, 2001 to appoint an attorney to represent him outside the Office of the Public Defender.

**1** If the government seeks the death penalty, 18 U.S.C. § 3593(a) requires it to file a notice with the court "a reasonable time before trial" stating its intention to seek the death penalty and identifying the aggravating factors that the government believes justify a sentence of death.

17

Second, I think the majority's "triggering event" analysis diverts attention from the true issue in this case: whether an offense punishable by death loses its character as a "capital crime" when the prosecution does not actually seek the death penalty. The majority treats the phrase "capital crime" as if its meaning were self-evident. I am less confident in my analysis. I believe that there are at least two plausible constructions of "capital crime": (1) a crime for which the law authorizes the death penalty, and (2) a crime for which the prosecution actively seeks the death penalty. Although this Court's opinion in Watson opted for the first definition, all other courts that have addressed the issue have rejected it. See United States v. Grimes, 142 F.3d 1342, 1347 (11th Cir. 1998); United States v. Steel, 759 F.2d 706, 710 (9th Cir. 1985); United States v. Dufur, 648 F.2d 512, 514-15 (9th Cir. 1980); United States v. Shepherd, 576 F.2d 719 (7th Cir. 1978); United States v. Weddell, 567 F.2d 767, 770 (8th Cir. 1977); United States v. Davidson, 1992 WL 165825, *1-*5 (N.D.N.Y. 1992).

Because of its obvious importance to this case, I think the Watson decision merits close scrutiny. The historical context of that case was peculiar. This Court decided Watson shortly after the Supreme Court handed down Furman v. Georgia, 408 U.S. 238 (1972). The defendant in Watson had been convicted under a statute indistinguishable from that under which the Furman defendants had been convicted. 496 F.2d at 1126. Thus, any death sentence imposed on defendant Watson would have been constitutionally void. Prior to trial, defendant had requested the appointment of additional counsel. The district court denied this request. Id. On appeal, the defendant claimed that this refusal to grant additional counsel violated the command of § 3005. The government, in turn, claimed that § 3005 did not apply, as the death penalty had been deemed by the Supreme Court to be unconstitutional in cases like the one at bar. Id. The question before the court in Watson therefore was a stark one: did Furman judicially repeal the statutorily-conferred procedural safeguards vouchsafed defendants in capital cases?

Noting its extreme reluctance to encroach on the territory of the legislative branch, a divided panel declared that defendant Watson was entitled to two attorneys under § 3005 even though Furman had foreclosed the possibility of his being sentenced to death. Id. at 1128-29. The majority's analysis hinged on its guess as to the legislative

18

intent underlying § 3005. After noting the dearth of legislative history relating to that provision, the court declared:

> Were we convinced that defendant's exposure to the risk of imposition of the death penalty was the sole reason for the two-attorney requirement in § 3005, we would be inclined to agree with the government. However, we believe that there is a significant chance that other considerations also underlay the two-attorney requirement.

Id. at 1128. The court then opined that because crimes punishable by death are typically difficult to try, Congress may have intended § 3005 to "buttress the defense" so as better to protect defendant's rights:

> [I]t seems to us that it is more likely than not that an alleged offense of the type for which Congress has purportedly continued the death penalty will be a complex and difficult case to prepare and try. . . . It is not unlikely that Congress may have also sought to buttress the defense with two attorneys to provide greater assurance that a defendant's rights would be fully observed. As a consequence, we are unable to say, absent a clear legislative expression, that the possibility of imposition of the death penalty was the sole reason why Congress gave an accused the right to two attorneys. It follows that we cannot say that Furman effects a judicial repeal of § 3005.

Id. at 1128. In dissent, District Judge Herbert Murray (sitting by designation) expressed his opinion that the sole reason Congress provided additional counsel in capital cases was the nature of the punishment:

> In adding the right to additional counsel in capital cases, it seems obvious that the reason for it was the finality of the punishment involved, not any inherent complexity of capital cases. Many such cases are much simpler and easier to try from the point of view of counsel than, for example, a multi-defendant narcotics conspiracy trial. The writer of this opinion believes that in a desire to guard against human error,

19

the first Congress felt it desirable to have two lawyers keeping watch on each other when the life of the client was at stake.

Id. at 1130-31. Thus, he argued that the defendant's right to additional counsel under § 3005 evaporated once Furman abrogated the death penalty in cases like his.

I believe that Watson was wrongly decided. I agree with Judge Murray that it is the finality of the punishment, not the complexity of the offense, that undergirds the two-attorney requirement of § 3005. Nevertheless, had Congress been silent on the matter in the intervening years, principles of stare decisis might require that I join with the majority in finding that Defendant was entitled to two attorneys. Congress, however, has not been silent.

In 1994 Congress amended § 3005 in conjunction with the enactment of the Federal Death Penalty Act. The amendment changed the wording from:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel learned in the law; and the court . . . shall immediately, upon his request, assign to him such counsel, not exceeding two, as he may desire . . . .

to the language that appears in the current § 3005:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases . . . .

Federal Death Penalty Act (Title VII of the Violent Crime Control and Law Enforcement Act of 1994) § 60026, Pub. L. No. 103-322, 108 Stat. 1796 (emphasis added). I think the changes wrought by the amendment reveal the majority's construction of "capital crime" to be

20

erroneous. The requirement that counsel be "learned in the law applicable to capital cases" clearly refers to the simultaneously-enacted sentencing and appeal provisions of the Federal Death Penalty Act. See 18 U.S.C. § 3592 (identifying aggravating and mitigating factors to be considered in determining whether sentence of death is justified); 18 U.S.C. § 3593 (specifying that the prosecutor must give notice of intent to seek death penalty and outlining the unique post-conviction procedure for sentencing in a capital case); 18 U.S.C. § 3595 (providing procedures for appeal of sentence of death). In a given case, these provisions come into play only _after_ the government has decided to pursue the death penalty and apprised the court of its intention to do so. Where the government decides _not_ to seek the death penalty, the sentencing and appeal provisions of the Federal Death Penalty Act simply do not apply. As the Government notes, it would be pointless to require that defense counsel be "learned in the law applicable to capital cases" if such erudition were irrelevant to the issues raised in the case. But that is exactly what the majority interprets § 3005 to require here. By construing "capital crime" to encompass even those cases where the prosecution specifically indicates that it will not seek the death penalty, the majority requires appointment of counsel "learned in the law applicable to capital cases" where expertise in the sentencing and appeal provisions of the Federal Death Penalty Act is wholly unnecessary. On remand, Defendant will have to be appointed counsel "learned in the law applicable to capital cases" even though there is no chance that such law will be applied to his particular case. I think that this incongruous result reveals the majority's construction of "capital crime" to be in error. The amendment makes sense only if one construes "capital crime" to denote only those offenses for which the government actually seeks the death penalty.

Responding to these arguments, the majority points out that it is the present policy of the Department of Justice to allow defense counsel to participate in the process whereby it determines whether it will seek the death penalty. This policy, it argues, shows that appointing a death penalty expert would be of help to a defendant _even prior_ to the government's decision to seek the death penalty. I think that this is irrelevant. The current practices of the Department of Justice shed no light on the Congressional purpose in providing two attorneys in capital cases. The Death Penalty Act itself gives defendants no right

21

to participate in the process by which the Justice Department determines whether to seek the death penalty. The Act specifies only that "[i]f . . . the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter" he shall notify the court and the defendant of this intention. § 3593(a). The decision to treat the matter as a capital crime is a matter of pure prosecutional discretion. United States v. McVeigh, 944 F. Supp. 1478, 1483-84 (1996) ("The issuance of these notices is essentially a prosecutor's charging decision."). That the Department of Justice has chosen to exercise this discretion in such a way as to allow defense input is of no moment to the interpretation of the two-attorney provision of § 3005. By giving this argument credence, the majority makes the interpretation of this section depend in part on the happenstance of internal Department of Justice policy. This strikes me as letting the tail wag the dog.

The majority also observes that the operative language "Whoever is indicted for . . . [a] capital crime" was not changed in the 1994 amendment. However, words -- like people -- are known by the company they keep. An alteration in one part of a statute, therefore, can prompt a court to reexamine its construction of an unaltered portion of that statute. For the reasons stated above, I believe the 1994 amendments showed that the Watson court was mistaken in believing that Congress intended defendants to get the special protections of § 3005 even where the government does not actually seek the death penalty. I believe that the natural interpretation of "applicable to capital cases" indirectly reveals that "capital crime" refers only to those offenses for which the prosecution actively seeks the death penalty.

Finally, I think it is important to emphasize that Watson is an outlier case -- both within and without the Fourth Circuit. As noted above, every other court that has addressed the specific issue of right to counsel under § 3005 has held that additional counsel is not required where the prosecution does not seek to impose the death penalty. Thus, had Congress surveyed the pertinent law at the time of the 1994 amendments, it would have found the courts to be in unison on the issue -- with the lone exception of Watson's Furman-era asterisk. Congressional silence generally is not a reliable guide to statutory interpretation. When Congress reenacts a statute, however, it is presumed to endorse the "settled judicial interpretation" of it. Holder v.

22

Hall, 512 U.S. 874, 921 (1994) (Thomas, J., concurring); Central Bank of Denver v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 185 (1994). The present case, where Congress has tinkered with a specific provision, falls somewhere between Congressional silence and the reenactment rule. I believe that when Congress amended § 3005 to include "learned in the law" but did not further define "capital crime," it acquiesced in the line of circuit court decisions holding that a defendant is not entitled to two attorneys where the government does not actually seek the death penalty.

Even in the Fourth Circuit, Watson is an aberration. An earlier case, not mentioned by the Watson court, held that the procedural protections generally afforded capital defendants do not apply when there is no chance that the death penalty will be imposed. Hall v. United States, 410 F.2d 653, 660 (4th Cir. 1969). In Hall, as here, the defendant was indicted for a crime that was punishable by death. At trial, defense counsel complained that he had not been given the government's witness list three days in advance of trial as required for "capital offenses" by 18 U.S.C. § 3432. In response, the government disavowed any intention to seek the death penalty. The district judge allowed the trial to proceed. On appeal, the Fourth Circuit affirmed, holding that "the procedural safeguards normally provided in capital cases" are not required where the prosecution states in open court[2] that it will not ask for the death penalty.

For all of these reasons, I believe that Boone was not entitled to two attorneys under 18 U.S.C. § 3005. I therefore respectfully dissent from Part II of the majority opinion. I would affirm Boone's conviction on both Count I and Count II.

_____

[2] Given the notice requirement of 18 U.S.C. § 3593, the government's silence in this case is the functional equivalent of the prosecution's declaration not to seek the death penalty in Hall.

23