06-0581-cr
USA v. Douglas

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2007

(Argued: October 16, 2007          Decided: May 13, 2008)

Docket No. 06-0581-cr

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

PAUL RYAN DOUGLAS,

Defendant-Appellant.

_____

Before:  KEARSE and KATZMANN, Circuit Judges, and RAKOFF,

District Judge*.

Appeal from an amended judgment entered in the United States District Court for the Southern District of New York, Colleen McMahon, Judge, convicting defendant of killing a person in connection with an attempt to steal money from ATM machines. See 18 U.S.C. §§ 2113(a) and (e).

Affirmed.

STEPHEN J. RITCHIN, Assistant United States Attorney, New York, New York (Michael J. Garcia, United States Attorney for the Southern District of New York, Karen B.

_____

* Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

Konigsberg, Celeste L. Koeleveld, Assistant United States Attorneys, New York, New York, on the brief), for Appellee.

CLINTON W. CALHOUN, III, White Plains, New York (Briccetti, Calhoun & Lawrence, White Plains, New York, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Paul Ryan Douglas appeals from an amended judgment, entered in the United States District Court for the Southern District of New York following a jury trial before Colleen McMahon, Judge, convicting him of killing a person in connection with an attempt to enter a bank with intent to commit a crime therein, in violation of 18 U.S.C. §§ 2113(a) and (e), and sentencing him principally to a mandatory term of life imprisonment and ordering him to pay $11,081.44 in restitution. On appeal, Douglas contends principally (1) that, because a § 2113(e) offense may be punished by death, he was entitled to representation by two attorneys, see 18 U.S.C. § 3005, and the district court erred in dismissing one of his two appointed attorneys after the government stated that it would not seek the death penalty; (2) that the government engaged in impermissible discrimination in the use of a peremptory challenge during jury selection; (3) that there were various errors in connection with the eyewitness identification evidence admitted against him; and (4) that evidence obtained in violation of his privilege against self-incrimination should not

have been admitted in evidence in the government's rebuttal case. For the reasons that follow, we affirm.

## I.  BACKGROUND

The present prosecution arose out of an attempted theft from automated teller machines ("ATMs") at a branch of Citibank, N.A., located in a building on Central Park Avenue in Yonkers, New York (the "Yonkers ATMs"), during which an ATM technician was killed.  Douglas was tried on a two-count superseding indictment that charged him with attempting to enter a bank facility with intent to commit larceny therein, in violation of 18 U.S.C. § 2113(a) (count one), and killing a person in connection with that attempt, in violation of 18 U.S.C. §§ 2113(a) and (e) (count two). We summarize the evidence as to the robbery attempt, as well as the evidence as to Douglas's ensuing flight and statements, in the light most favorable to the government.

### A.  The Government's Direct Case

In 2004, Citibank ATMs were serviced by Brink's, Inc. ("Brink's"), which periodically replenished the machines with cash. From late 1999 through mid-2002, Douglas was an employee of Brink's. Part of his job had been to fill the Yonkers ATMs with $400,000 to $500,000 in cash on Thursday mornings.

In April 2004, Milton Moran, Jr. ("Moran"), was employed

by Brink's as an ATM repair technician. On the morning of Thursday, April 22, 2004, Moran went to the building in which the Yonkers ATMs were located to repair an ATM printer. For such an assignment, Moran normally carried, inter alia, a pouch containing (a) keys to give him access to the backs of the ATMs and (b) the various codes for disabling alarms and for releasing the electronic locks on the backs of the ATMs; as a matter of Brink's policy, he also carried a gun. At 8:54 on that Thursday morning, Moran notified Brink's that he had arrived at the Yonkers ATMs facility; at 9:02 a.m. he notified Brink's that he was about to depart.

At about 10:00 or 10:30 that morning, John Vitetta, who worked in a ground floor office in the building in which the Yonkers ATMs were located, was in the parking lot working on his car when he saw a body being dragged between an SUV and an adjacent Toyota. Thinking the body was a CPR mannequin, Vitetta returned his attention to his car. After hearing a thud and looking up again, he saw feet sticking out of the trunk of the Toyota and saw a man standing behind the open trunk. Realizing that the body he had seen being dragged was not that of a mannequin but that of a person, Vitetta ran into his office and called 911. At trial, Vitetta pointed out Douglas as the man he had seen standing behind the trunk in which the body had just been placed. Vitetta also testified that he had selected the picture of Douglas from a six-picture photographic array shown to him by the police two days after the event.

When the police arrived at the parking lot in response to Vitetta's 911 call, they opened the trunk of the Toyota and found Moran, dead, with duct tape wrapped around his mouth and head. Moran had extensive bruising on the head, along with contusions on his arm and hand that were consistent with defensive wounds. The cause of death was determined to be principally asphyxia due to smothering, along with blunt force trauma to the head and face. The keys and codes that Moran had used to gain access to the back and interior of the ATM machine were missing. And although Moran was wearing a gun holster and carrying a gun permit, his gun was missing.

Marilyn Sarin, employed in the same office as Vitetta, had heard Vitetta calling 911 and describing what he had seen. She had then run into the parking lot and had seen an SUV back swiftly out of a parking spot and speed out of the lot through the marked entrance rather than the exit. Sarin testified at trial that the vehicle was driven by "a heavyset, black male with dark facial hair." (Trial Transcript ("Tr."), at 178.) Although Sarin was unsure whether she would recognize the driver if she saw him again, she testified that when she was shown a six-picture array four days after the incident, see Part II.C.1. below, she selected the picture of Douglas as the driver.

In addition, upon observing the SUV on the morning of April 22, Sarin wrote down the SUV's license plate number. Records revealed that the vehicle belonged to a woman with whom Douglas was

-5-

living in Brooklyn. When the SUV was recovered several days later, its contents included a loaded shotgun, a bulletproof vest, a suitcase containing men's clothing and toiletry items, Douglas's social security card, and his then-recently expired Jamaican passport.

Douglas, after exiting the Yonkers ATMs parking lot on April 22, shortly left the New York area by bus and made his way to Florida. There he made statements to his cousin and a close friend of the family, both of whom were called as witnesses by the government.

Douglas told those witnesses that he had planned, in collaboration with Moran, to steal money from ATM machines immediately after the machines received cash infusions. Douglas was to hit Moran on the head and bind his mouth and hands to make it appear that Moran had been a robbery victim. Douglas said he had hit Moran on the head and taped Moran's mouth while they were in the SUV; that the Brink's truck bringing cash to the ATMs did not arrive when expected; and that while he and Moran were waiting, Moran pointed out that the tape on his mouth had come loose and Douglas tightened it. Douglas said he then went to the ATMs to check on whether the cash had been delivered, and when he returned to the SUV, he found Moran unresponsive, and he panicked. He put Moran's body in the trunk of Moran's car and fled in his girlfriend's SUV.

On April 26, Douglas turned himself in to the police in Florida, saying, inter alia, that he had been involved in a robbery

attempt in New York in which a man had died.

B.  Douglas's Defense

Douglas's defense consisted principally of his own testimony.  He admitted that he had made most of the statements to which his cousin and friend testified; but Douglas testified that he had given them a story that he had "made up" (Tr. 569).  Douglas testified that he had in fact been at the site of the Yonkers ATMs on the morning in question, had put Moran's body in the trunk of Moran's car, and had left the scene in his girlfriend's SUV.  He also admitted that he had gone to Florida and told his cousin and their friend that he and Moran had planned to rob the ATMs together and that Moran had accidentally died.  However, Douglas denied that he had said anything about hitting Moran, tying him up, or taping his mouth; he also denied that he had gone to see whether the ATMs' expected cash delivery had arrived or had tightened the tape on Moran's mouth.  Douglas testified that in fact Moran had been killed by another man.

Douglas testified that some three months prior to April 22, he encountered a man he had not met before and the man began extorting money from him by threatening him and his family.  Douglas--who testified that in Jamaica he had been a policeman for more than six years--never notified the authorities of the extortion (see, e.g., Tr. 612-15); he gave the man money on several occasions (a total of $13,000 (see id. at 752)), indeed draining his bank

account (and borrowing on his credit cards and pawning his jewelry) to do so (see id. at 473-74). Douglas described the man as darker-skinned than himself, with dreadlocks or twists in his hair, but testified that he did not know the man's name. However, the man somehow knew, without any input from Douglas, that Douglas had formerly worked at Brink's. On April 20, Douglas agreed to drive the unnamed man to the site of the Yonkers ATMs on the morning of April 22 (see Tr. 482-83), and on April 22 he did so with the unnamed man holding a gun to his neck. Douglas testified that it was this unnamed man who killed Moran.

Douglas testified that after he drove the unnamed man to the Yonkers ATMs location, he drove around the parking lot, then parked for a while, and then exited the lot and parked on the street, adjacent to the lot. Douglas then got out of the SUV and sat on the back bumper while the unnamed man sat in the SUV and cased the location for purposes of a robbery. After Douglas saw Moran, whom he knew, approaching the building and sorting through a ring of keys, Douglas reentered the SUV; the unnamed man asked who Moran was, and Douglas informed him that Moran was an ATM technician. The unnamed man forced Douglas to reenter the parking lot. When Moran reappeared some 10 minutes later after leaving the building and approached his own car, the unnamed man exited the SUV, approached Moran, and jammed his gun into Moran's back. The man forced Moran to drive Moran's car from its spot in front of the ATM-area entrance to a corner of the lot and beckoned to Douglas to

bring the SUV to the parking spot next to Moran's car; the man then put Moran into the back seat of the SUV. The unnamed man also climbed into the SUV's back seat, and he forced Moran to give him the keys, to identify those that unlocked the doors to the ATMs, and to disclose the alarm-disabling codes. The man then gave Douglas the keys and codes and told him to make sure the codes were correct.

Douglas testified that before he went to check on the ATM codes, the unnamed man asked whether he had rope to tie up Moran; Douglas responded that he did not have rope but volunteered that he did have duct tape "if that can help" (Tr. 522), and he gave the man his duct tape. Douglas testified that he then left the SUV and walked around the corner of the building in which the ATMs were located but that he never entered or attempted to enter the building; after remaining out of sight of the unnamed man for some 10-15 minutes, he returned to the SUV, got into the driver's seat, and said the codes were good. The unnamed man was by then in the front passenger seat. When Douglas could not see Moran in the back seat, he got out and opened the back door and found Moran on the floor, bruised, gagged, and unresponsive. Douglas got into the back seat and tried to pull the duct tape from Moran's mouth but was unsuccessful.

Douglas testified that he "was crying and then the crying turned to rage." (Tr. 544.) He suddenly "remembered" that he had in the back of the SUV a shotgun (see id.)--which he had begun to carry in his own vehicle because he was being threatened by the

- 9 -

unnamed man and which he transferred to the rear area of the SUV on the eve of these events (see id. at 488-92). Douglas testified that when he remembered the shotgun, he "jumped up and . . . reached for" the shotgun case, "unzipped the case," pulled the shotgun out and "brought it forward," and then "racked it," making a "cha-chu" sound. (Id. at 544-45.) When he then pointed the shotgun at the unnamed man, the man jumped out of the car and fled on foot.

Douglas testified that, after some deliberation, he pulled Moran's body out of the SUV, and it hit the ground with a very loud thud. Douglas testified that he then saw Vitetta in the parking lot, watching him. Douglas put Moran's body in the trunk of Moran's car. He then drove the SUV to Brooklyn, left it in a hospital parking garage, and fled to Florida.

C. The Government's Cross-examination and Impeachment of Douglas

In cross-examining Douglas, the government elicited answers that, inter alia, highlighted the implausibilities in his story. For example, having begun to carry the shotgun and bullet-proof vest precisely because he was afraid of the unnamed man, and having put them into the back of the SUV on April 21 knowing he would be driving the unnamed man to Yonkers the next morning, Douglas testified that he made no attempt to get the shotgun or vest on April 22 when the unnamed man went off to intercept Moran and left Douglas alone in the SUV. Having testified that he cried after seeing Moran's condition, Douglas admitted that his only attempt to

revive Moran was the unsuccessful effort to remove the tape from Moran's mouth, and that although he did not know whether Moran was still alive (he made no attempt to discern whether Moran still had a pulse), it never occurred to him to take Moran into the doctor's office that Douglas knew was in the building. And despite proclaiming his innocence at trial, during the nearly 20 months between his arrest in this case and his testifying at trial Douglas had made no effort whatever to tell the authorities about the unnamed man.

The government also asked Douglas about his decision to put Moran's body in the trunk of Moran's car:

> Q: So the decision to take this dead body and dump it into the trunk of a car, that was your decision, right?

> A: Yes, that was all mine.

> . . .

> Q: Now Milton was an ATM tech, right?

> A: That is correct.

> Q: And ATM techs are armed, right?

> A: Yes, I think they are, far as my recollection.

> Q: And you know that, right?

> A: Yes.

> Q: And Milton was armed that day, right?

> A: I don't know if he was.

> Q: You have no idea whether he was armed?

> A: No.

Q: You have no idea whether he had a gun on him?

A: I think he might have, but I'm not sure.

Q: You're not sure whether he had a gun on him? You have no idea what happened to that gun?

A: No, I didn't do anything.

(Tr. at 674-75 (emphases added).) As discussed in Part II.D. below, the government was then allowed to question Douglas with respect to a statement he had made about Moran's gun to the police in Florida, which the government had acknowledged was inadmissible in its case-in-chief because it had been given in response to questioning before Douglas was given warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). Douglas had told the Florida police that he had thrown Moran's gun off a bridge.

The government continued its cross-examination of Douglas by asking whether, when he put Moran's body in the trunk of the Toyota, he noticed that Moran's gun holster was empty. Douglas responded that he did not observe a holster, and he reiterated that he did not do anything with Moran's gun and did not know what happened to it. The government then asked him about being questioned by Florida police officers who were relaying an inquiry from the police in Yonkers as to the whereabouts of Moran's gun. Douglas denied telling the Florida officers that he had thrown the gun off the bridge.

In its rebuttal case, the government called two Florida police officers, who testified that Douglas told them he had thrown

Moran's gun off a bridge. The district court instructed the jury that it was to consider this evidence for impeachment purposes only, and not for its truth.

D. The Verdict and the Sentence

The jury found Douglas guilty on both counts of the superseding indictment, i.e., attempted entry of a bank facility with intent to commit a felony therein, in violation of 18 U.S.C. § 2113(a), and killing a person in connection with that attempt, in violation of 18 U.S.C. §§ 2113(a) and (e).

On Douglas's motion, consented to by the government, the district court essentially concluded that the offense of attempted entry of a bank with intent to commit a felony therein in violation of 18 U.S.C. § 2113(a) is included within the § 2113(e) offense of causing the death of a person while committing that § 2113(a) offense, and it entered a judgment of conviction only on the latter count. As 18 U.S.C. § 2113(e) provides that any person who kills another in the course of violating § 2113(a) shall be punished by death or life imprisonment, and as the government had announced prior to trial that it would not seek the death penalty, the district court sentenced Douglas principally to life imprisonment. Douglas was sentenced on January 31, 2006. The court deferred decision on the matter of restitution, pending receipt of additional information.

On May 3, 2006, no restitution order having yet been entered, Douglas wrote to the court, contending that such an order could no longer be entered against him because 18 U.S.C. § 3664(d)(5) provides that a restitution order may be entered up to 90 days after sentencing. Douglas argued that as he had been sentenced on January 31, 2006, the period within which a restitution order could be entered had ended on May 1, 2006.

On May 5, 2006, the district court entered an order rejecting the untimeliness contention, finding that Douglas was not prejudiced by the delay from May 1 to May 5, and ordering him to pay Brink's and Moran's father restitution totaling $11,081.44. See Part II.E.2. below. An amended judgment, adding the restitution order, was entered, and this appeal followed.

## II. DISCUSSION

On appeal, Douglas contends principally (1) that, because he was charged with an offense that was statutorily punishable by death, he was entitled to representation by two attorneys pursuant to 18 U.S.C. § 3005 despite the government's notification that it would not seek the death penalty; (2) that the government used a peremptory challenge during voir dire to discriminate against him on the basis of race; (3) that there were various errors in connection with the admission of the identification testimony by Vitetta and Sarin; and (4) that the court improperly allowed the government to

cross-examine him--and to introduce rebuttal evidence--about his postarrest response to questioning by the police in Florida, without Miranda warnings, that he had possessed and disposed of Moran's gun. Douglas also contends, inter alia, that the evidence was insufficient to support a finding that he attempted to enter the Yonkers ATMs facility and that the restitution order was untimely and substantively improper. Finding no basis for reversal, we affirm.

A.   The Claim of Entitlement to Representation By Two Attorneys

Count One of the superseding indictment against Douglas charged him with attempting to enter a banking facility with intent to commit a larceny therein, in violation of 18 U.S.C. § 2113(a). Count two charged that in connection with that offense, Douglas killed Moran in violation of subsection (e) of that section, which provides that "[w]hoever, in committing any offense defined in this section, . . . kills any person, . . . shall be punished by death or life imprisonment." 18 U.S.C. § 2113(e) (emphasis added).

The original indictment against Douglas, which also charged him with violating § 2113(e), was filed on September 27, 2004. The first attorney appointed to represent Douglas following his arrest was Paul E. Davison, Esq., of the Office of the Federal Defender. On October 5, 2004, in light of the potential death sentence if Douglas were convicted on count two, Davison requested the appointment for Douglas, pursuant to 18 U.S.C. § 3005, of a

second attorney, one learned in the law applicable to capital cases. The court granted that request by order dated October 6, 2004, appointing Clinton W. Calhoun, III, Esq., who was learned in the law applicable to capital cases, as an additional attorney to represent Douglas.

By letter dated March 2, 2005, the government informed Douglas and the court that it would not seek the death penalty in the present case. (See also Conference Transcript, March 9, 2005, at 2.) Douglas requested that the court nonetheless continue the appointment of both Calhoun and Davison as his attorneys. The court rejected the request, reasoning that where there was no longer a potential death sentence, the services of counsel learned in the law applicable to capital cases were no longer needed. The court concluded that "the government only needs to pay for one lawyer from this point forward . . . ." (Id. at 3.) Douglas was allowed to decide which attorney would continue to represent him, and, without waiving his objection to the court's ruling, he opted for Calhoun.

On this appeal, Douglas contends, raising an issue of first impression in this Court, that the district court's refusal to continue the appointment of a second attorney for him following the government's notification that it would not seek the death penalty violated his right under 18 U.S.C. § 3005 to be represented by two attorneys and that he is therefore entitled to a new trial. We disagree.

Section 3005 provides that when a person "is indicted for

[a] capital crime,"

> the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 . . . counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours.

18 U.S.C. § 3005 (emphases added). The section states plainly that such death-penalty-qualified counsel is to be appointed promptly in a case involving a capital crime; but it is silent as to whether the court has an obligation to continue the appointment after the government has announced that it does not seek the death penalty.

However, "the purpose of the two-attorney right is to reduce the chance that an innocent defendant would be put to death because of inadvertence or errors in judgment of his counsel," United States v. Waggoner, 339 F.3d 915, 918 (9th Cir. 2003) (internal quotation marks omitted), cert. denied, 543 U.S. 1005 (2004), and all but one of our Sister Circuits that have dealt with this issue have reasoned that once the government has announced that it does not seek the death penalty, the case is no longer a capital case, see, e.g., United States v. Casseus, 282 F.3d 253, 256 (3d Cir.), cert. denied, 537 U.S. 852 (2002), and the appointment of counsel learned in death penalty law may be terminated, see, e.g., United States v. Waggoner, 339 F.3d at 917-19; In re Sterling-Suarez, 306 F.3d 1170, 1174-75 (1st Cir. 2002); United States v. Grimes, 142 F.3d 1342, 1347 (11th Cir. 1998), cert. denied, 525 U.S. 1088 (1999).

In United States v. Waggoner, for example, the district

court appointed death-penalty-qualified second counsel on an interim basis, pending the government's determination of whether to seek the death penalty. After the government announced that it would not seek that penalty, the court terminated the appointment. The Ninth Circuit found no error in either the conditional nature of the appointment or the termination of the appointment once the death penalty was no longer a potential sentence:

> The question we address in this case is whether the defendant's right to be represented by two attorneys is extinguished once the threat of capital punishment has been irrevocably removed from the slate of available punishments.
>
> In this case, the district court properly concluded that the defendant was not entitled to be represented by two attorneys after the government filed formal notice that it did not intend to seek the death penalty.
>
> . . . .
>
> . . . [W]hen a defendant is no longer subject to "indictment" for a "capital crime" because the threat that the death penalty will be imposed has been eliminated, the defendant no longer has a statutory right to a second court-appointed attorney to defend him at the trial of the non-capital offense.

339 F.3d at 917, 919 (emphasis added).

Similarly, in United States v. Grimes, in which the government had "stated, on the record prior to trial, that it would not seek the death penalty in this case," the Eleventh Circuit ruled that the defendant "was properly denied benefits afforded to a capital defendant because the Government stipulated that it would not seek the death penalty and thereby transformed this case into a

non-capital proceeding." 142 F.3d at 1347. See also In re Sterling-Suarez, 306 F.3d at 1175 (granting mandamus requiring the district court to appoint death-penalty-qualified second counsel promptly, rather than wait for a decision by the government as to whether to seek or eschew the death penalty, stating that "there are practical reasons to treat the case as capital from indictment forward, for purposes of appointing learned counsel, until it becomes clear that the death penalty is no longer an option" and the matter is no longer a "capital case") (first emphasis in original; second emphasis ours); United States v. Casseus, 282 F.3d at 256 (holding that any error in the district court's refusal to appoint death-penalty-qualified second counsel was harmless in light of the facts that during plea negotiations the defendants were not pressured by the possibility of death sentences and that the government announced prior to trial that it would not seek the death penalty; "after the government declared that it would not seek the death penalty, the appellants were no longer capital defendants").

Other Circuits had similarly held that § 3005 did not require the appointment of a second attorney where a sentence of death was precluded by the Supreme Court's decision in Furman v. Georgia, 408 U.S. 238 (1972), which invalidated the death penalty under statutory schemes then in effect. See, e.g., United States v. Shepherd, 576 F.2d 719, 727-29 (7th Cir.) (§ 3005 "does not apply because there is no possibility that the death penalty can be imposed"), cert. denied, 439 U.S. 852 (1978); United States v.

Weddell, 567 F.2d 767, 770-71 (8th Cir. 1977) (in light of Furman, the case "lost its capital nature as charged in the indictment. It follows that the district court did not err in rejecting Weddell's request for the appointment of a second attorney pursuant to 18 U.S.C. § 3005."), cert. denied, 436 U.S. 919 (1978).

So far as we are aware, only the Fourth Circuit has taken an opposite view, although the precise contours of that Circuit's views of the scope of § 3005 are not entirely clear. In United States v. Boone, 245 F.3d 352, 358-61 (4th Cir. 2001) ("Boone"), in which one count charged the defendant with an offense that could be punished by death and the district court did not appoint death-penalty-qualified counsel, the Fourth Circuit ordered a new trial on that count despite the fact that the government had not sought the death penalty. The Boone court ruled that the § 3005 right to the appointment of death-penalty-qualified counsel in a case where the death penalty may be imposed attaches upon indictment and that that right is absolute and not extinguished, even when the government does not in fact seek the death penalty. See id. at 358-59.

Although in Boone, the court ruled that the error in failing to appoint such counsel could not be deemed harmless, see id. at 361 n.8, the Fourth Circuit viewed the rights created by § 3005 as less absolute in United States v. Robinson, 275 F.3d 371, 383-84 (4th Cir.) ("Robinson"), cert. denied, 535 U.S. 1006 (2002), declining to reverse a conviction where death-penalty-qualified counsel had been appointed but the appointment was terminated--

without objection--after the government elected not to seek the death penalty. In Robinson, the court stated that "[u]nder Boone, the failure to provide Robinson with two attorneys throughout trial was plain error even though the Government withdrew its notice of intent to seek the death penalty," id. at 384 (emphasis added); but the Robinson court concluded that "the failure to provide a non-capital defendant with the benefit of a provision designed to provide additional protection to capital defendants[ ]did not affect the fairness, integrity, or public reputation of judicial proceedings," id. (emphases in original); see also Boone, 245 F.3d at 360 ("Surely, if the government decides not to seek the death penalty, then the penalty phase is won before trial . . . .").

In any event, we agree with the majority of the federal courts of appeals that once the government has formally informed the court and the defendant of its intention not to seek the death penalty, the matter is no longer a capital case within the meaning of § 3005 and that section does not require the district court to continue the appointment of a second attorney. The district court in the present case properly appointed such counsel for Douglas upon his request shortly after the filing of the original indictment; and it was not error for the court to rule that after the government's renunciation of any intent to seek the death penalty, Douglas was not entitled to representation by more than one government-funded attorney.

Finally, we emphasize that the question on this appeal is

whether the district court erred in requiring Douglas to proceed with only one government-funded attorney once it became clear that he would not be subject to the death penalty.  Our conclusion that § 3005 does not entitle a defendant to a second attorney under these circumstances would not preclude a district court, in its discretion, from maintaining the dual appointment in a future case out of a "concern for fairness at the trial of a criminal offense," United States v. Durant, 545 F.2d 823, 827 (2d Cir. 1976). "[N]o right ranks higher than the right of the accused to a fair trial." United States v. King, 140 F.3d 76, 81 (2d Cir. 1998) (internal quotation marks omitted).  In this case, the district court discontinued Davison's appointment nine months before the trial was scheduled to begin, leaving more than enough time for Calhoun, Douglas's remaining attorney, to get ready for trial and undertake whatever responsibilities had been shouldered by Davison.  Deciding when, if ever, the retention of both counsel is necessary in the interest of justice after the government has announced it will not seek the death penalty is an exercise best left to the broad discretion of the district court.

B.  The Government's Use of Peremptory Challenges

Douglas, a man of color originally from Jamaica, contends that under Batson v. Kentucky, 476 U.S. 79 (1986), he is entitled to a new trial on the ground that the government, in exercising a peremptory challenge during jury selection, discriminated against

him on the basis of race, in violation of his right to equal protection. This claim is based on the peremptory challenge by the government to a prospective juror (apparently a man of color) who had stated in response to the court's initial background questions that he was from Jamaica.

In Hernandez v. New York, 500 U.S. 352 (1991), the Supreme Court discussed the framework for analyzing a defendant's claim of discriminatory use of peremptory challenges, established by Batson in the context of a claim of discrimination based on race:

> . . . Batson . . . outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. 476 U.S., at 96-98. . . . First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Id., at 96-97. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Id., at 97-98. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Id., at 98.

Hernandez, 500 U.S. at 358-59 (plurality opinion).

As to the prosecution's burden to proffer a neutral explanation, the Court has stated that "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Purkett v. Elem, 514 U.S. 765, 767-68 (1995) (internal quotation marks omitted). Discriminatory intent may be found to be inherent where the proffer of a supposedly race-neutral explanation has a racial ingredient. See, e.g., Walker v. Girdich, 410 F.3d 120, 123 (2d Cir. 2005)

(ordering a new trial where the prosecutor began her proffer by stating that "'one of the main things [she] had a problem with was that this [wa]s an individual who was a Black man with no kids and no family'" (quoting prosecutor) (emphasis in Walker)).

Since "'a finding [as to whether there was] intentional discrimination is a finding of fact,'" and "the trial court findings . . . in this context . . . 'largely will turn on evaluation of credibility,'" Hernandez, 500 U.S. at 364, 365 (plurality opinion) (quoting Batson, 476 U.S. at 98 n.21) (other internal quotation marks omitted), the trial court's finding as to whether the prosecutor's reason was race-neutral may be overturned only if that finding is clearly erroneous, see Hernandez, 500 U.S. at 369 (plurality opinion); id. at 372, 375 (concurring opinion of O'Connor, J.) ("I agree with the plurality that we review for clear error the trial court's finding as to discriminatory intent, and agree with its analysis of this issue." "[I]f . . . the trial court believes the prosecutor's nonracial justification, and that finding is not clearly erroneous, that is the end of the matter."). It is well established that "'[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous,'" id. at 369 (plurality opinion) (quoting Anderson v. Bessemer City, 470 U.S. 564, 574 (1985)).

Where a prosecutor has articulated multiple reasons for his peremptory challenge, one of which is race, "dual motivation" analysis is appropriate. See, e.g., Howard v. Senkowski, 986 F.2d

24, 24 (2d Cir. 1993). In those circumstances, the Batson claim should be rejected if the prosecutor persuades the court "that the challenges would have been exercised for race-neutral reasons even if race had not been a factor." Id.

The record in the present case persuades us that the district court permissibly found that the government articulated, and possessed, a neutral reason for excusing the juror in question and that he would have been excused whether or not race was a consideration. In conducting the voir dire, the district judge determined that several prospective jurors had actually served on a jury; one member of this group was Mr. Stewart, who had previously stated that he was from Jamaica. The court stated that each member of the group would be asked to describe his or her jury service without disclosing the verdict, if any:

Each of you I want to answer the following

question:

When were you a juror?

What kind of a case?

Did the jur[y] reach a verdict? Yes or no.
Not what the verdict was. Did you reach a verdict?
Yes or no.

Or if the case settled or for whatever reason
you didn't deliberate, just say, we didn't
deliberate. Okay?

(Jury Selection Transcript ("J.S. Tr."), at 67 (emphasis added).)
The court then asked each member of the group in turn to answer these questions. When the court called on Mr. Stewart, he

responded: "It was three years ago and there was a not-guilty verdict." (Id. at 68 (emphasis added).) The judge stated: "There was a verdict. Thank you. I don't want to know what the verdict is, people, I just want to know if you reached a verdict." (Id.)

The government used its first peremptory challenge to excuse Mr. Stewart, and Douglas promptly made a Batson objection. The court conducted the following inquiry:

> THE COURT: . . . . [A p]rima faci[e] case of discrimination in jury selection is established when a defendant is a member of a cognizable racial group, the prosecutor uses a peremptory challenge to remove members of that group from the jury and these facts and other relevant circumstances raise an inference the prosecutor has excluded jurors on account of their race.
>
> I assume this is your challenge, Mr. Calhoun?
>
> MR. CALHOUN: Yes, it is, your Honor.
>
> . . . .
>
> . . . Your Honor, we have so few persons of color to deal with in this group of jurors . . .
>
> . . . .
>
> . . . [I]n listening to Mr. Stewart's . . . answers to your Honor's questions and watching him during jury selection, I discern no valid basis . . . why he should be challenged. The only remote connection I saw was that he's from Jamaica, but I don't know if national origin means anything at all. I don't see any basis why he should be challenged, and I ask the court to determine whether there is a racially neutral explanation for why the government challenged him.
>
> THE COURT: Mr. Ritchin?
>
> MR. RITCHIN [Assistant United States Attorney ("AUSA")]: Your Honor, I would point to a number of factors.

- 26 -

First, . . . there is no pattern here. This is the Government's first strike.

The second of which is the factor that Mr. Calhoun pointed to, he is from the same country as the defendant and there's some concern that he might, therefore, have sympathy for the defendant.

A third factor is that, despite the court's instruction that . . . jurors not . . . give the verdict of any case on which they have sat, Mr. Stewart did provide that verdict in response to the question indicating some inability to follow directions.

And the fourth factor I suppose is the answer he gave, which, for a prosecutor, gives some pause.

THE COURT: Correct. I anticipated that this was going to happen, and you're going to have to convince me, Mr. Calhoun, that the reason Mr. Stewart was challenged was something other than he announced to the world that he was on a jury, that he voted to acquit a defendant. If I were a prosecutor, he's the first guy I'd want off.

MR. CALHOUN: Well, I don't know if I can convince anybody of that, but I think it's far more likely that he misunderstood your Honor's instruction about not revealing the verdict. I don't know why--without knowing anything about the case and anything about the evidence that was presented in that case, it may have been a perfectly fine verdict.

THE COURT: May have been. That's not to say that a prosecutor wouldn't want such a person off the jury, whether the person was black, white or purple.

MR. CALHOUN: I just don't think that the fact that he was on some jury somewhere sometime in the past and rendered a not-guilty verdict or participated in a verdict that was not guilty, I don't think it means anything at all, and I don't see why it would be any factor at all in determining whether to challenge somebody.

(J.S. Tr. 96-99 (emphases added).)

Although the court noted that one of the reasons given by the AUSA--that Mr. Stewart was from the same country as Douglas--was not neutral, it found that the explanation that Mr. Stewart had served on a jury that returned a verdict of acquittal was a neutral reason and one that the court found to be genuine--and, indeed, so predictable a basis for peremptory challenge that it was the impetus for the court's instruction that the prospective jurors not disclose their prior verdicts:

> THE COURT: . . . . <u>As far as I'm concerned, in this instance, the government has given a race-neutral reason for challenging Mr. Stewart.</u> I reiterate, the minute he said that, I said, I see what's coming, a challenge and a <u>Batson</u>.
>
> But Mr. Stewart, in response to the court's question about prior jury service, indicated that he was on a jury that reached a verdict. <u>He further indicated it was a criminal case, and then, contrary to my instruction, he announced that the jury had acquitted in that case.</u>
>
> It's entirely possible, as Mr. Calhoun says, that he misunderstood my instruction; however, he did give that information, and <u>if I were a prosecutor, I would want such an individual off the jury myself. That is the reason that I don't ask that question.</u> No Judge I know wants that information out because <u>acquitters tend to be people that the government does not want</u>, the prosecution does not want. Convictors . . . tend to be . . . people that the defendant doesn't want.
>
> <u>It's an absolutely race-neutral reason for striking him from the jury</u>, the same-country argument is not, and the inability to follow instructions is not persuasive. But <u>the fact that the defendant was on the jury that it voted to acquit is a completely race-neutral reason striking him from the jury</u> and the <u>Batson</u> challenge is disallowed.

(J.S. Tr. at 99-100 (emphases added).)

- 28 -

Although Douglas argues that the government did "not put forth clearly" that "Mr. Stewart had been on [a] jury that voted for acquittal" as one of its reasons for excusing Mr. Stewart (Douglas brief on appeal at 40), the district court plainly so understood the AUSA's articulation of his "fourth factor"--as apparently did defense counsel, who argued that "it may have been a perfectly fine verdict" (J.S. Tr. 98). Plainly, the AUSA's concern for the nature of the verdict was sufficiently clear.

Further, the record quoted above shows that the trial court found the AUSA's neutral explanation to be credible. The finding that individuals of any race or color who have served on juries that acquitted "tend to be people the government does not want" is a permissible view, and the court's finding that the government would have used a peremptory challenge to excuse Mr. Stewart regardless of race is not clearly erroneous. We conclude that the court properly rejected Douglas's Batson challenge.

Finally, to the extent that Douglas may be suggesting that he was denied equal protection on the ground that the government discriminated against him on the basis of national origin, we note that while Batson has been extended beyond race to apply to peremptory challenges based on ethnicity, see Hernandez, 500 U.S. 352, and gender, see J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 128-29 (1994), this Court has not decided the issue of whether national origin "is a cognizable [classification] for Batson protection." Rodriguez v. Schriver, 392 F.3d 505, 511 n.9 (2d Cir.

2004). Assuming, however, that a peremptory challenge based entirely on national origin would violate equal protection, we conclude that a national-origin-based <u>Batson</u> challenge here fails for the reasons stated above, <u>i.e.</u>, that the government had a neutral reason for excusing Mr. Stewart and that he would have been excused even if national origin had not been a consideration.

C. <u>Challenges to the Identification Testimony</u>

Douglas makes several claims of error with respect to the admission of the identification testimony of Vitetta and Sarin. He contends that their identifications of him were unreliable because they resulted from impermissibly suggestive photographic arrays; that the court erred in excluding from evidence an affidavit signed by Sarin that cast doubt on her identification of Douglas; and that the government suppressed evidence contradicting or impeaching those witnesses's identifications, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). We find no merit in these contentions.

1. <u>The Alleged Suggestiveness of the Photographic Array</u>

As described in Part I.A. above, Vitetta identified Douglas at trial as the man he had seen in the parking lot just after Moran's body had been dragged on the ground and put in the trunk of the Toyota; and both Vitetta and Sarin testified that they had identified Douglas from the photographic array that they were shown in the days following April 22. Prior to trial, Douglas moved unsuccessfully to suppress those photographic identifications and to

preclude any in-court identification of him on the ground that the photographic array was "impermissibly suggestive and created a significant risk of misidentification" (Memorandum in Support of Defendant's Pretrial Motions, dated February 4, 2005, at 9). On this appeal, Douglas contends that the district court erred in summarily denying this aspect of his suppression motion, arguing principally that (a) one of the photos was a picture of "a known murderer" that "had been prominently displayed in tabloids in the New York area" (Douglas brief on appeal at 35), and (b) the background colors in the photos made the picture of Douglas stand out from the others. His contentions are meritless.

A defendant's right to due process includes the right not to be the object of suggestive police identification procedures that make an identification unreliable. See, e.g., Manson v. Brathwaite, 432 U.S. 98, 106 (1977) ("Brathwaite"); Neil v. Biggers, 409 U.S. 188, 198 (1972) ("Biggers"); Simmons v. United States, 390 U.S. 377, 384 (1968). Generally, a witness will not be allowed to make an in-court identification if the authorities' pretrial photographic identification procedures were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons, 390 U.S. at 384 (emphasis added). And "[w]hile th[at] phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of 'irreparable' it serves equally well as a standard for the

admissibility of testimony concerning the out-of-court identification itself." Biggers, 409 U.S. at 198. Thus, "in determining the admissibility of identification testimony" for either pretrial or in-court identification, "reliability is the linchpin . . . ." Brathwaite, 432 U.S. at 106 n.9, 114.

"We review the district court's determination of the admissibility of identification evidence for clear error." United States v. Mohammed, 27 F.3d 815, 821 (2d Cir.), cert. denied, 513 U.S. 975 (1994). We may review the photographic array itself to assess its fairness. See, e.g., United States v. Jacobowitz, 877 F.2d 162, 168 (2d Cir.), cert. denied, 493 U.S. 866 (1989).

We see no merit in Douglas's contention that the array was tainted by the presence of a picture of John Royster, a convicted killer of some notoriety. The frequent appearance of Royster's picture in New York area newspapers had occurred some eight years earlier, and the district judge noted, "I did not recognize this photograph, although I regularly read the newspapers . . . ." Order dated March 23, 2005, at 8. The district court stated that "if a witness actually recognized Royster, that witness presumably would not have selected him, and thus would have viewed the array as a five-person array rather than a six-person array. There is nothing inherently improper about a five-person array." Id. We agree.

Further, we have reviewed the photographic array and see no hint of suggestiveness. All are head-shot photographs, all of brown-skinned, non-bespectacled men in roughly the same age group,

with short-cropped hair, non-receding hairlines, and thin or trimmed mustaches. Only one of the six (Royster) has a thin face, suggesting a thinner build than the others. As to the background colors of the photos, no two are the same, and no picture stands out because of its background color. The district court found that "[i]t simply cannot be said that 'the picture of the accused . . . so stood out from all [of] the other photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit.'" Id. (quoting Jarrett v. Headley, 802 F.2d 34, 41 (2d Cir. 1986) (other internal quotation marks omitted)). We see no error in that finding.

Given the lack of any suggestiveness in the photo array, the identification testimony of Vitetta and Sarin was admissible at trial "without further inquiry into the reliability of the pretrial identification[s]," United States v. Maldonado-Rivera, 922 F.2d 934, 973 (2d Cir. 1990), cert. denied, 501 U.S. 1211 (1991), of Douglas as the man Vitetta saw standing behind the car into whose trunk Moran's body had just been dumped and as the man Sarin saw driving the SUV out of the parking lot. And if there had been any error in not conducting a further inquiry as to the reliability of those identifications, we would conclude that such an error was without a doubt harmless in light of the trial testimony of Douglas himself, described in Parts I.B. and I.C. above, that it was he who drove the SUV out of the parking lot, and that during his dealings with Moran's body, he had seen Vitetta watching him.

## 2. The Exclusion of Sarin's Affidavit

Douglas also contends that the trial court erred in excluding from evidence a Sarin affidavit that stated that the driver of the SUV might have been white. Evidentiary rulings of the district court are reviewed for abuse of discretion, see, e.g., Old Chief v. United States, 519 U.S. 172, 174 n.1 (1997); United States v. Abel, 469 U.S. 45, 54-55 (1984), and we see no abuse of discretion here.

In a hearing outside the presence of the jury, Sarin was questioned about an affidavit she had signed on the afternoon of April 22, in which the driver of the SUV was described as a "'heavyset male, possibly white'" (Tr. 124). She testified, "I was asked if he was possibly, could he have possibly been white. I said, he was possibly white but I was confident that he was a black male." (Id.)

In the presence of the jury, Sarin testified, as described in Part I.A. above, that the driver of the SUV was a heavyset, black male with dark facial hair, and that she had selected the picture of Douglas from the photographic array as the driver of the SUV. On cross-examination, Douglas's attorney was allowed to have Sarin read from her April 22 affidavit the statement, "'I saw a heavyset male, possibly white, with a beard, driving the SUV.'" (Tr. 190.) When defense counsel asked whether Sarin had "said heavyset male, possibly white?" she responded, "Possibly white, yes." (Id. at 191.)

On redirect examination, Sarin testified that her April 22 affidavit had been prepared by the police detective interviewing her; that she did not tell the detective what words to use in the affidavit; that she had not read the typed affidavit carefully for the accuracy of its contents before she signed it; and that she did not notice that its only reference to the race of the person she was describing was "possibly white." (Id. at 193-94.) Sarin testified that when she was asked by the detective to describe the SUV's driver, she had "said he was a heavyset, black male"; that when asked if the driver could have been white, she had said "possibly"; and that it was not her recollection, either on April 22 or at the time of trial, that the driver of the SUV was white. (Id. at 194.)

On recross-examination, defense counsel brought out that Sarin's statement was taken just hours after the events on April 22; that she had given the detective the information about what she had seen; that she knew her statements were of importance to the police investigation; that she had wanted to be accurate; that "the document recites that the driver [Sarin] saw was a heavyset male, possibly white" (id. at 197); and that Sarin had signed the affidavit under penalty of perjury.

Plainly, Douglas was allowed at trial to cross- and recross-examine Sarin fully about the affidavit. He was allowed to have her read aloud the portion of the affidavit that said that she had seen a "'heavyset male, possibly white, with a beard, driving the SUV.'" (Id. at 190.) And he was allowed to quote the "heavyset

male, possibly white" language to the jury repeatedly (see, e.g., id. at 190, 191, 197). In light of the latitude given to Douglas to examine Sarin repeatedly with respect to that phrase in the affidavit, we see no abuse of discretion in the court's refusal to allow Douglas also to introduce the affidavit itself.

### 3. The Posttrial Brady Motion

Following his conviction, Douglas unsuccessfully moved for a new trial on the ground that the government had failed to disclose to him prior statements by Vitetta and Sarin and notes of their interviews by agents of the Federal Bureau of Investigation ("FBI") (collectively "the Vitetta/Sarin documents") until the Friday before the Monday on which the trial began, thereby violating his due process rights as declared in Brady v. Maryland, 373 U.S. 83, and its progeny, e.g., Giglio v. United States, 405 U.S. 150 (1972). He pursues this contention on appeal.

Under Brady and its progeny, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material" to the accused's guilt or punishment, Brady, 373 U.S. at 87. Materiality encompasses the notions that the suppressed evidence is favorable to the accused and that he was prejudiced by its suppression. See, e.g., Kyles v. Whitley, 514 U.S. 419, 434 (1995) ("the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence"). Thus, as discussed further below, "[t]here are three

components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued," Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

Where a defendant's "Brady claim was raised in a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, we review the denial of the motion for abuse of discretion." United States v. Gil, 297 F.3d 93, 101 (2d Cir. 2002) ("Gil"). For the reasons that follow, the district court did not abuse its discretion in concluding that Douglas established none of the three components of his Brady claim.

To begin with, Douglas does not complain that the Vitetta/Sarin documents were not disclosed, but only that he received them just one business day (three calendar days) before trial. The record in this case does not lend itself to the conclusion that the timing of the government's disclosure of these documents constituted their "suppression" within the meaning of Brady.

> With respect to when the prosecution must make a disclosure required by Brady, the law . . . appears to be settled. Brady material must be disclosed in time for its effective use at trial, see, e.g., Leka v. Portuondo, 257 F.3d 89, 100 (2d Cir.2001), or at a plea proceeding, see United States v. Persico, 164 F.3d 796, 804 (2d Cir.1999); Tate v. Wood, 963 F.2d 20, 24 (2d Cir.1992).

In re United States (Coppa), 267 F.3d 132, 135 (2d Cir. 2001) (emphasis in original). Brady material that is not "disclos[ed] in

sufficient time to afford the defense an opportunity for use" may be deemed suppressed within the meaning of the Brady doctrine. Leka v. Portuondo, 257 F.3d 89, 103 (2d Cir.2001). But

> as long as a defendant possesses Brady evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner. There is no Brady violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial. . . .

In re United States (Coppa), 267 F.3d at 144. In Gil, we held that a document that was "exculpatory and impeaching Brady material," given to the defendant on the Friday before a Monday trial, was in effect suppressed within the meaning of Brady as it was buried in the midst of "five reams of paper labeled '3500 material,'" Gil, 297 F.3d at 103, 106.

Although Douglas relies on Gil for his contention that the Vitetta/Sarin documents were suppressed, Gil is readily distinguishable. In that case, the documents delivered to the defendant on the Friday before trial consisted of more than 600 exhibits, totaling some 2,700 pages. Further, Gil's focus was a memorandum written by and to persons other than the witness whose testimony it would impeach; and the entry for that document in the 41-page index to the exhibits identified the document only by the initials of the witness, without mention of the names of its author or addressee. We concluded that, given the delivery of the document in that obscure fashion, "the defense was not in a position to read it, identify its usefulness, and use it." Id.

Here, in contrast, the documents given to Douglas on the Friday before trial totaled only some 290 pages. They were grouped according to the witness to which they pertained and were easily recognizable as such, with the documents relating to a given witness fastened with a clip. The Vitetta/Sarin documents related only to the statements of Vitetta and Sarin themselves, respectively, not to statements by others. The documents relating to Vitetta totaled just 11 pages. The documents relating to Sarin totaled 7 pages, plus an eighth page that was inadvertently omitted on Friday and was sent by fax on the following afternoon. The 19 pages of Vitetta/Sarin documents were easily found and fathomed. We cannot conclude that they were suppressed.

Nor did Douglas establish that he was prejudiced by not having received the Vitetta/Sarin documents earlier. As to Vitetta, Douglas focuses in particular on an FBI report and handwritten notes stating that when Vitetta first entered the parking lot to work on his car, he saw the Toyota idling and thought the man he saw in the driver's seat was darker-skinned than the man he saw standing behind the Toyota just after Moran's body had been dumped into it. As to Sarin, Douglas complains particularly about not having had the affidavit discussed in Part II.C.2. above, which stated that the man Sarin had seen driving the SUV out of the parking lot was "possibly white," along with an FBI report and notes to the same effect.

Douglas argues first that these documents could be used to impeach the credibility of Vitetta and Sarin by "clearly

discredit[ing] their trial testimony that Douglas was the one and only person they saw at the scene." (Douglas brief on appeal at 56.) But that impeachment potential reveals no prejudice, for the district court noted that the documents were in fact used to attempt the impeachment of both witnesses on cross-examination, to emphasize discrepancies on summation, and to argue on summation substantively that there was another person at the crime scene. See Decision Denying Motion for a New Trial, dated January 30, 2006 ("Decision Denying New Trial"), at 16. The court observed that "the information contained in the supposedly suppressed documents . . . was used at trial, to the best possible effect." Id.

Douglas also argues that late disclosure of the Vitetta/Sarin documents deprived him of the opportunity "to follow up on any leads from the descriptions or from Vitetta or Sarin" (Douglas brief on appeal at 57). The district court, in rejecting this argument in Douglas's new-trial motion, noted that Douglas "made no proffer of any defense efforts made to locate or speak with Vitetta or Sarin, in person or by telephone, in the four days between disclosure of their prior statements and their testimony," and that Douglas "did not seek an adjournment of the proceedings." Decision Denying New Trial at 17. More importantly, we note that Douglas provides no hint as to what sort of "leads" could have been gleaned from the Vitetta/Sarin documents; and none come to mind, given Douglas's testimony that, inter alia, he knew who had killed Moran but just did not know the man's name.

Finally, Douglas did not establish that the information in the Vitetta/Sarin documents was material.

> [The] touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

Kyles, 514 U.S. at 434 (internal quotation marks omitted); see also Leka v. Portuondo, 257 F.3d at 104.

> [S]trictly speaking, there is never a real "Brady violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

Strickler, 527 U.S. at 281.

The contents of the Vitetta/Sarin documents plainly do not meet this test. Although Vitetta was recorded by one investigator as having stated that he had thought the man in the idling Toyota was darker-skinned than the man he saw standing behind the Toyota just after Moran's body was put in the trunk, Vitetta testified that upon seeing Douglas's picture in the photographic array he realized they were the same man because the facial characteristics were the same. Moreover, even if they were not the same man, Vitetta's prior statement provided no substantive support for Douglas's version of the events, for (1) Vitetta said he saw only one person in the idling Toyota, whereas in Douglas's version of the events, both the

unnamed man and Moran were in that vehicle; and (2) whereas Vitetta had stated that the dark-skinned man was in the driver's seat of the Toyota, according to Douglas's testimony the unnamed man--the only person whom Douglas described as darker-skinned than himself--forced Moran to drive the Toyota. Thus, the prior Vitetta statement was inconsistent with Douglas's own scenario.

Similarly, to the extent that Sarin had said that the driver of the SUV was "possibly white," that statement provided no substantive support for Douglas's defense. In his version of the events, Douglas did not mention any white person. Further, all Sarin saw, according to her testimony and the documents, was a man backing the SUV (whose licence plate she noted) out of a parking space and driving it out of the parking lot. Sarin maintained at trial and in a preliminary hearing that she had said, and was confident, that the driver was a heavyset black man; she had selected the picture of Douglas as the driver; and Douglas himself testified that he had driven the SUV out of the lot.

In sum, the contents of the Vitetta/Sarin documents were not favorable to Douglas for they were inconsistent with his version of the events, and they provide no basis for finding any reasonable probability that earlier disclosure of those documents would have produced a different verdict. The district court properly rejected Douglas's Brady claim.

D. The Challenge to the Impeachment of Douglas with His Postarrest, Pre-Miranda-Warnings Statement that He Had Disposed

- 42 -

of Moran's Gun

Prior to trial, Douglas moved to suppress, inter alia, the statement he made to police officers in Florida that he had thrown Moran's gun off a bridge. In response to that motion, the government acknowledged that Douglas had not been advised of his Miranda rights prior to being questioned as to the whereabouts of the gun (see Government's Memorandum of Law in Opposition to Pre-Trial Motions of Paul Ryan Douglas, dated February 25, 2005, at 4), and it stated that that statement "will not be offered by the Government in its case in chief" (id. at 7).

At trial, the government made no reference to that statement in its case-in-chief. However, after Douglas testified to his version of the events of April 22, including his testimony that he put Moran's body into the trunk of Moran's car but had had no role in assaulting or killing Moran, and his testimony that he freed himself from the control of the unnamed man by getting the shotgun from the back of the SUV, the government sought to cross-examine Douglas as to whether Moran was armed and what had happened to Moran's gun, and to impeach him (through both cross-examination and rebuttal evidence) with his statement to the Florida police that he had thrown Moran's gun off a bridge. The trial court, after receiving briefing from the parties, ruled that the government's proposed cross-examination was permissible and its rebuttal evidence admissible, citing, inter alia, United States v. Payton, 159 F.3d 49, 58 (2d Cir. 1998) ("When a defendant offers an innocent

explanation" for his conduct, "he 'opens the door' to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination."). Douglas contends that this was error; we disagree.

"It is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth." United States v. Havens, 446 U.S. 620, 626-27 (1980). Thus, the Supreme Court has "repeatedly insisted that when defendants testify, they must testify truthfully or suffer the consequences." Id. at 626 ("reject[ing] the notion that the defendant's constitutional shield against having illegally seized evidence used against him could be 'perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances'" (quoting Harris v. New York, 401 U.S. 222, 226 (1971))). Accordingly, statements taken from a defendant in violation of his Miranda rights, though they may not be introduced by the government during its case-in-chief, are nonetheless admissible to impeach statements made by the defendant in the course of his testimony. See, e.g., Harris, 401 U.S. at 226 (admissible to impeach direct testimony); Oregon v. Hass, 420 U.S. 714, 721-22 (1975) (same); see also Havens, 446 U.S. at 627-28 (evidence seized in violation of the defendant's Fourth Amendment rights is admissible to impeach testimony given by the defendant on cross-examination). Cross-examination questions with

respect to a defendant's otherwise privileged statements are justifiable if they "would have been suggested to a reasonably competent cross-examiner by [the defendant's] direct testimony." Id. at 626.

Although Douglas contends that cross-examination about Moran's gun was improper because Douglas's direct testimony made no mention of that gun, we disagree. Douglas testified that he was innocent of any wrongdoing with respect to Moran, although he admitted that he had pulled Moran out of the SUV, dragged Moran to Moran's car, and hoisted him into the trunk of that car. Douglas also testified that while the unnamed man was in the front seat of the SUV, Douglas had entered the back seat with Moran and tried unsuccessfully to remove the tape from Moran's mouth; and, as set out in Part I.B. above, Douglas testified that when his tears turned to rage, he "jumped up" and "reached" into the rear of the SUV, pulled out a case containing a shotgun, "unzipped the case," pointed the shotgun at the unnamed man, noisily "racked" the shotgun, and was thereby able to cause the unnamed man to flee. (Tr. 544-45.) Whether the focus was (a) on what Douglas observed as he pulled Moran from the SUV, dragged his body to the Toyota, picked up Moran's body, and dumped the body into the trunk of the Toyota, or (b) on Douglas's potentially swifter access to and--far less noticeably to the unnamed man--accessing of a weapon other than the shotgun in its zippered case in the rear of the SUV, these aspects of Douglas's direct testimony would have suggested to any

"reasonably competent cross-examiner" a question as to whether Moran was wearing a gun. When Douglas admitted on cross-examination, as set out in Part I.C. above, that he knew ATM technicians were usually armed but responded that he was not sure whether Moran was armed, that he had no idea what had happened to Moran's gun, and that he, Douglas, "didn't do anything" (Tr. 675), the government was entitled to impeach him by asking him whether he hadn't in fact stated to the police in Florida that he had thrown Moran's gun off a bridge. When Douglas denied that he had made such a statement, the government was entitled to impeach that denial by calling as witnesses in its rebuttal case the Florida officers to whom the statement was made. The trial judge properly instructed the jury that the rebuttal evidence was to be considered only for purposes of impeachment, not for its truth; and we see no error.

E. Other Contentions

Douglas's other contentions, which include challenges to the sufficiency of the evidence and the restitution order, also provide no basis for relief.

1. The Sufficiency Challenge

Section 2113(a) of Title 18 provides in pertinent part as follows:

> (a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, . . . any property or money or any other thing of value belonging to, or

in the care, custody, control, management, or possession of, any bank . . . ; or

Whoever enters or attempts to enter any bank . . . or any building used in whole or in part as a bank, . . . with intent to commit in such bank . . . , or building, or part thereof, so used, any felony affecting such bank . . . and in violation of any statute of the United States, or any larceny--

Shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 2113(a). In the superseding indictment, Douglas was charged with violating the second paragraph of that section. At trial, he unsuccessfully moved pursuant to Fed. R. Crim. P. 29 for a judgment of acquittal, arguing that the attempt prohibited by the second paragraph is not attempted larceny but only attempted entry into the bank building (with intent to commit a felony therein) and that the government failed to prove such an attempted entry because there was no evidence that he made any "physical effort to get into the building" housing the Yonkers ATMs (Tr. 797; see id. at 427 ("there has to be some move in the direction of trying to get into-- physically getting into the bank")). Douglas pursues this contention on appeal.

The standard for establishing a criminal attempt is well settled.

In order to establish that a defendant is guilty of an attempt to commit a crime, the government must prove that the defendant had the intent to commit the crime and engaged in conduct amounting to a "substantial step" towards the commission of the crime. . . . For a defendant to have taken a substantial step, he must have engaged in more than mere preparation, but may have stopped short of the last act necessary for the actual

commission of the substantive crime.

United States v. Yousef, 327 F.3d 56, 134 (2d Cir.) (discussing 18 U.S.C. §§ 32(a)(1), (2), and (7) (2000) (which prohibited destruction of and attempts to destroy aircraft)) (other internal quotation marks omitted), cert. denied, 540 U.S. 933 (2003); see, e.g., United States v. Mowad, 641 F.2d 1067, 1073 (2d Cir.), cert. denied, 454 U.S. 817 (1981); United States v. Manley, 632 F.2d 978, 988-89 (2d Cir. 1980) ("Manley"), cert. denied, 449 U.S. 1112 (1981); United States v. Jackson, 560 F.2d 112, 117-20 (2d Cir.), cert. denied, 434 U.S. 941 (1977). Under this standard, a defendant may be found guilty of attempting to enter a banking facility even if he did not move physically to breach its perimeter, so long as he took a substantial step toward attempting to gain entry.

Although Douglas contends that the "substantial step" standard does not apply to § 2113(a), his only argument in support of that contention relies on the current version of Rule 31(c) of the Federal Rules of Criminal Procedure, which provides as follows:

> (c)  Lesser Offense or Attempt.  A defendant may be found guilty of any of the following:
>
> (1) an offense necessarily included in the offense charged;
>
> (2) an attempt to commit the offense charged; or
>
> (3) an attempt to commit an offense necessarily included in the offense charged, if the attempt is an offense in its own right.

Fed. R. Crim. P. 31(c) (2002).  Douglas apparently takes the position (a strange one for a defendant to endorse) that under

subpart (2), a defendant may be convicted of an attempt to commit an offense even if no statutory provision prohibits such an attempt; he thus argues that Congress's express prohibition against "attempts to enter" in § 2113(a) would be "unnecessary surplusage," on the theory that "Congress did not need to insert those words because the prosecutor could rely on Rule 31(c)" (Douglas brief on appeal at 48), unless Congress intended to require proof of more than the traditional "substantial step" to establish the offense of attempt under § 2113(a).  This argument has several flaws.

In addition to noting the obvious due process concerns for the possibility of convicting a defendant of an attempt that is not prohibited by any statutory provision, see, e.g., Fiore v. White, 531 U.S. 225, 228 (2001) (conviction of a defendant for conduct that a "criminal statute . . . does not prohibit . . . . violate[s] due process"), we see no basis for inferring that Congress's inclusion in § 2113(a) of an express prohibition against attempts to enter a bank building for felonious purposes was based on any thought that "the prosecutor could rely on Rule 31(c)" (Douglas brief on appeal at 48).  That prohibition appeared in § 2113's predecessor as amended in 1937, see 50 Stat. 749 (1937), codified at 12 U.S.C. § 588b (1940), and thus predated the Federal Rules of Criminal Procedure (adopted in 1944, effective March 21, 1946) by several years.  Further, when § 2113(a) was enacted in 1948 and until 2002, Rule 31(c) stated that

> [t]he defendant may be found guilty of an offense
> necessarily included in the offense charged or of an

> attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense.

Fed. R. Crim. P. 31(c) (1946) (emphases added). This provision was simply "a restatement of existing law, 18 U.S.C. former § 565." Fed. R. Crim. P. 31 Advisory Committee Note (1944 Adoption); see Act of June 1, 1872, § 9, 17 Stat. 196, 198 (a defendant "may be found guilty of an attempt to commit the offence . . . charged: Provided, That such attempt be itself a separate offence." (first emphasis in original; second emphasis ours)). Thus, there was and is "no general federal statute proscribing attempt," and we have consistently held that an attempt to commit criminal conduct "is therefore actionable only where . . . a specific criminal statute makes impermissible its attempted as well as actual violation," Manley, 632 F.2d at 987 (emphasis added); see, e.g., United States v. Dhinsa, 243 F.3d 635, 675 (2d Cir. 2001) ("'[u]nder Fed.R.Crim.P. 31(c), a defendant may be found guilty of an attempt to commit a substantive offense, whether or not the attempt was charged in the indictment, provided an attempt is punishable'") (quoting United States v. Marin, 513 F.2d 974, 976 (2d Cir. 1975) (emphasis ours)), cert. denied, 534 U.S. 897 (2001). Accordingly, far from creating surplusage, Congress's inclusion in § 2113(a) (and its predecessor) of an express prohibition against attempts to enter a bank was essential in order to permit a defendant to be convicted of such an attempt.

To the extent that Douglas argues that the current version

of Rule 31(c) permits a defendant to be convicted of attempt even in the absence of a statutory prohibition against such an attempt, it can hardly be inferred that, in introducing the attempt prohibition in 1937 and including it in § 2113(a) in 1948, Congress had in mind the reformulation of Rule 31(c) in 2002. But even had the attempt prohibition been added to § 2113(a) contemporaneously with or subsequent to the 2002 reformulation of Rule 31(c), Douglas's argument would fare no better. Although the format of the 2002 version of Rule 31(c) is different from that of its predecessors, with the current "if the attempt is an offense" language appearing only in subpart (3), the pertinent Advisory Committee Note states that the changes in Rule 31 "are intended to be stylistic only." Fed. R. Crim. P. 31 Advisory Committee Note (2002). Accordingly, we reject the notion that the 2002 amendment to Rule 31(c)(2) was intended to introduce the principle that a defendant may permissibly be convicted of an attempt that is not prohibited by statute. We thus see no basis for Douglas's contention that the normal "substantial step" standard for proving the crime of attempt--which was applied in all of the above attempt cases--is inapplicable to § 2113(a).

To the extent that Douglas contends also that the evidence was insufficient to show that he took a substantial step toward entering the building housing the Yonkers ATMs, we reject that contention, crediting, as we must, every inference that could have been drawn in the government's favor and deferring to the jury's

resolution of the weight of the evidence and the credibility of the witnesses, see, e.g., United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998). Pieces of evidence are to be viewed not in isolation but in conjunction, see, e.g., United States v. Podlog, 35 F.3d 699, 705 (2d Cir. 1994), cert. denied, 513 U.S. 1135 (1995), and the conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). These principles apply whether the evidence being reviewed is direct or circumstantial. See, e.g., Glasser v. United States, 315 U.S. 60, 80 (1942).

As the district court noted in denying Douglas's motion for acquittal in the present case, there was ample evidence from which the jury could infer that Douglas "took substantial steps to commit the crime of entering the Citibank branch at 1915-25 Central Park Avenue for the purpose of stealing money from the ATM machines located there." (Tr. 800.) The record included evidence that Douglas had knowledge, by means of his prior employment with Brink's, that the Yonkers ATMs were replenished with hundreds of thousands of dollars in cash on Thursday mornings; that on Thursday morning April 22, Douglas drove to that facility from his home in Brooklyn, some 20-to-30 miles away, bringing, inter alia, a shotgun and a bulletproof vest; that Douglas went back and forth between the SUV and the bank to see whether the weekly cash infusion had been made; that when Moran arrived at the Yonkers ATMs facility to fix an

ATM printer he had the keys and codes needed to gain access to the backs and interiors of the ATMs; and that after Douglas clubbed Moran and hid his body, those keys and codes were missing.

The jury could easily have inferred that Douglas assaulted Moran in order to obtain the keys and codes needed to gain access to the ATMs and that Douglas took those items. Those inferences, in the circumstances here, were more than sufficient to support a finding that Douglas took substantial steps toward entering the banking facility with intent to steal money from the ATM machines.

## 2. The Challenges to the Restitution Order

The district court, proceeding under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, ordered Douglas to pay $5,031.44 in restitution to Moran's father ("Moran Sr."), comprising $1,280 for unreimbursed funeral expenses and $3,751.44 for income lost by Moran Sr. as a result of his use of annual leave in order to participate in the investigation into the death of his son and attend the related court proceedings. The court ordered Douglas to pay $6,050 in restitution to Brink's, comprising $4,150 that Brink's paid for a headstone for Moran, plus $1,900 it paid to Moran Sr. to reimburse him for funeral-home expenses. Douglas contends (1) that the restitution award should be vacated in its entirety because it was entered more than 90 days after he was sentenced, and (2) that the awards to Brink's and the award of lost income to Moran Sr. were not authorized by the statute. There being no challenges to the

court's arithmetic calculations or the evidence to support them, Douglas's restitution challenges raise only issues of law, which we review de novo, see, e.g., United States v. Boccagna, 450 F.3d 107, 113 (2d Cir. 2006), and we find them to be without merit.

The provisions governing the procedures for the issuance of restitution orders state, inter alia, that if a victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the court may order restitution by a date "not to exceed 90 days after sentencing," 18 U.S.C. § 3664(d)(5). In the present case, Douglas was sentenced on January 31, 2006; the 90th day thereafter was May 1; the amended judgment imposing the restitution order was not entered until May 5. We have noted, however, that

> the purpose behind the statutory ninety-day limit on the determination of victims' losses is not to protect defendants from drawn-out sentencing proceedings or to establish finality; rather, it is to protect crime victims from the willful dissipation of defendants' assets.

United States v. Zakhary, 357 F.3d 186, 191 (2d Cir.) ("Zakhary"), cert. denied, 541 U.S. 1092 (2004). Accordingly, we have held that an extension of the proceedings beyond the 90-day period provides no basis for vacating the restitution order unless the defendant can show that the extension caused him actual prejudice. See id.; see also United States v. Johnson, 400 F.3d 187, 199 (4th Cir.) ("the procedural requirements of § 3664 are intended to protect victims, not the victimizers" (internal quotation marks omitted)), cert. denied, 126 S. Ct. 134 (2005). Douglas has provided no indication that he was in any way prejudiced by the fact that the restitution

- 54 -

order was entered on May 5, 2006, rather than May 1, and his challenge to the order's timeliness is thus rejected.

Nor do we find merit in any of Douglas's substantive challenges. The MVRA provides that with respect to a defendant convicted of an offense described in § 3663A(c)--which includes "any offense . . . in which an identifiable victim . . . has suffered a physical injury," 18 U.S.C. § 3663A(c)(1)(B)--"the court shall order . . . that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate," id. § 3663A(a)(1). For purposes of § 3663A,

> "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . . In the case of a victim who is . . . deceased, the . . . representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section . . . .

Id. § 3663A(a)(2).

As to the types of expenses to be compensated, subsection (b) of § 3663A provides, in pertinent part, that the restitution order is to require that the defendant,

> in the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

> (4) in any case, reimburse the victim for lost income . . . and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

18 U.S.C. §§ 3663A(b)(3) and (4). In addition, "[i]f a victim has

-55-

received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation . . . ."  18 U.S.C. § 3664(j)(1).

In objecting to the restitution award to Brink's, Douglas relies on a statement in Zakhary "that 'defendants have a due process interest in paying restitution only for losses actually sustained by victims'" (Douglas brief on appeal at 62 (quoting 357 F.3d at 191 n.4) (emphasis in brief)); and he cites our opinion in United States v. Reifler, 446 F.3d 65 (2d Cir. 2006), for the proposition that Brink's cannot properly be awarded restitution because it does not fit within the MVRA's definition of "victim" (see Douglas brief on appeal at 61-62).  Neither case advances Douglas's cause.

Douglas's reliance on Zakhary is misplaced because that case dealt with a "lump sum restitution order entered without any identification of victims and their actual losses."  357 F.3d at 190.  Thus, the context of the above-quoted language in the Zakhary footnote was the need to determine which of various entities had lost money, and hence were the victims of the defendant's crimes, see, e.g., id. ("mandatory restitution can only be imposed to the extent that the victims of a crime are actually identified" (internal quotation marks omitted)).  Here, there is no question that it was Brink's that reimbursed Moran Sr. $1,900 for part of Moran's funeral-home expense and paid $4,150 for Moran's headstone.

Douglas's reliance on Reifler is also misplaced, for we had no occasion in that case to interpret §§ 3663A(b)(3) and (4), as the restitution issues there concerned compensation for victims of financial fraud, rather than bodily injury. And the restitution orders in that case were held to be erroneous principally because they (1) ordered payments for losses that were not occasioned by the defendants' criminal conduct, and (2) ordered payments to persons who--far from being victims--were among the defendants' coconspirators, see 446 F.3d at 127.

Douglas's offense, in contrast, resulted in the death of Moran, occasioning his documented funeral and related expenses. Restitution with respect to that category of expenses was authorized by § 3663A(b)(3), and the MVRA required that restitution be ordered not only for Moran's "estate [or] another family member," who "may assume [Moran's] rights under this section," 18 U.S.C. § 3663A(a)(2), but also for any person who provided Moran's successors with compensation for losses for which restitution was appropriate, see id. § 3664(j)(1). Thus, the court did not err in ordering Douglas to pay restitution to Brink's for its reimbursement of Moran Sr. for funeral-home expenses. Nor did it err in ordering restitution to Brink's for its direct payment for Moran's headstone. Had Moran Sr. purchased the headstone, he plainly would have been entitled to restitution for that funeral-related expense as Moran's father or the representative of Moran's estate under §§ 3663A(a)(2) and (b)(3); and had Brink's then reimbursed Moran Sr. for the

headstone, Brink's would have been entitled to restitution for that reimbursement under § 3664(j)(1).  The fact that Brink's paid for the headstone directly rather than having Moran Sr. pay for it and reimbursing him does not relieve Douglas of the obligation to make restitution for the cost incurred.  See generally United States v. Malpeso, 126 F.3d 92, 95 (2d Cir. 1997) (upholding award of restitution to the FBI under the Victim and Witness Protection Act, the precursor to the MVRA, even though FBI had paid the expense directly instead of reimbursing the victim, there being "no significant functional or economic difference between the indemnitor's prior payment of the victim's expense and subsequent reimbursement").

Finally, Douglas contends that the district court erred in ordering restitution to Moran Sr. to compensate him for lost income, in the form of his expenditure of accrued annual leave to assist in the investigation and attend court proceedings.  While conceding that "Moran[] Sr. clearly is a 'victim' within the meaning of the MVRA," Douglas argued to the district court that Moran Sr.'s use of annual leave "actually prevent[ed] lost income.  It appears that the annual leave was used exactly as it is intended and cushioned Mr. Moran [Sr.] against incurring lost income." (Letter from Clinton W. Calhoun, III, to Judge McMahon dated April 27, 2006, at 2, 3.)  The district court properly rejected this argument.  It reasoned that if Moran Sr. had not had to use that annual leave for the days on which he assisted in the investigation and attended court proceedings, he

would have had the right to receive payment for those days upon leaving his job.  See, e.g., United States v. Jacobs, 167 F.3d 792, 796-97 (3d Cir. 1999).  We see no error in the court's conclusion that Moran Sr.'s expended annual leave in this case qualifies as lost income under § 3663A(b)(4).

                              CONCLUSION

        We have considered all of Douglas's arguments on this appeal and have found them to be without merit.  The judgment of the district court is affirmed.